### G. R. PETTIS v. THE STATE.

#### No. 2800. Decided March 23, 1904.

**1.—Continuance—Self-Defense—Issue Not Raised.**

Where the evidence showed that the issue of self-defense was not in the case, and that the absent witnesses had on the habeas corpus trial of defendant made no statement with reference to acts of deceased which could reasonably induce defendant to act in self-defense, there was no error in overruling the motion for continuance, notwithstanding the fact that said witness, son of defendant, had subsequently testified to acts of deceased apparently hostile towards defendant at the time of the homicide. Davidson, Presiding Judge, dissenting.

**2.—Same—Reasonable Apprehension of Danger.**

It is not every act, however trivial, even of an avowed enemy, which authorizes another to take his life; it must be some act or demonstration which under the circumstances would reasonably cause him to believe that his life was then in danger, or he was then in danger of serious bodily injury, from an attack then impending and about to be made upon him.

**3.—Evidence—Character of Deceased.**

Where appellant had by his own testimony indirectly put the character of deceased as a dangerous and violent man in issue, the State was properly permitted to show the contrary, and that deceased was a peaceable and law-abiding man.

**4.—Same—Firearms—Rebuttal.**

Where appellant upon the trial below contended that the testimony was doubtful as to whether deceased was armed at the time of the homicide, it was permissible on part of the State to show that the deceased owned no firearms and had none at home.

**5.—Same—Impertinent Testimony.**

Statements of deceased made in the presence of defendant to the effect that he had made certain derogatory remarks about defendant's wife and to hit him for it, all of which occurred after a former difficulty between them at a trial before a justice of the peace, was properly excluded at the trial of defendant for the murder of deceased, as it could not justify defendant in any manner, and was not pertinent to any issue in the case.

**6.—Same—Immaterial Testimony.**

Where the State showed that defendant went armed, although it did not attempt to show that he was hunting deceased, it was immaterial whether he

was going to church or to public gatherings, and there was no error in excluding such testimony.

**7.—Same—Declarations of Deceased—Immaterial.**

When the evidence showed that pending the first difficulty between defendant and the deceased, and long before the homicide, deceased had borrowed a gun from witness and had shortly thereafter returned it, and that since that time he had proffered to make peace with defendant and apologise, it was immaterial that at the time he borrowed the gun that he had declared he was going to kill a dog, even if such statement was a subterfuge.

**8.—Same—Harmless Error.**

Testimony with reference to witness' experiments with a Winchester rifle, which could not have injuriously affected defendant, although technically inadmissible, was harmless and not reversible error.

**9.—Same—Immateriality of Date—Rebuttal.**

Where the material point was the fact that the complaint against deceased was voluntarily made by the defendant, after the prior difficulty between him and the deceased, it was immaterial whether the date of the same was on the 17th or the 18th day of June, and it was competent for the State to show in rebuttal of his testimony that defendant had made said affidavit voluntarily and not at the request of the justice of the peace.

**10.—Same—Remarks of Witness.**

The statement of a witness that he told defendant if defendant was going to have use for a gun that witness had better not go with him, in a conversation between him and witness, at the time defendant started to the place where he expected to meet deceased was admissible, the remark being made in alluding to a prior difficulty between the defendant and deceased.

**11.—Same.**

Where a State's witness testified that at the request of deceased he approached defendant, some weeks after a prior difficulty between them, and that deceased offered to make peace, which defendant refused, there was no error in admitting in evidence the remark of the witness that that was all a man could do, and to which defendant made no reply.

**12.—Same—Irrelevant Statement of Witness.**

Where a prior difficulty arose from certain remarks alleged to have been made by the wife of the appellant about the wife of deceased, and with reference to which trouble deceased had offered to make peace with defendant, there was no error in excluding the testimony of appellant's wife, that she had not originated the talk about the wife of deceased.

**13.—Same—Statement of Deceased Not Relevant.**

Testimony offered by the defense to the effect that a month or two before the homicide witness heard deceased say, referring to a prior difficulty he had had with defendant, that defendant was an old coward and would not fight, was properly excluded.

**14.—Defendant as a Witness—Bill of Exceptions.**

It is within the discretion of the court to refuse the re-examination of appellant, after he had conferred with his counsel, unless it was with reference to some matter that was important in the interest of justice, which should have been presented by bill of exceptions.

**15.—Charge of the Court—Defendant's Animus.**

The court properly charged as to the effect to be given to previous quarrels, altercations and menaces on the part of deceased toward appellant, the effect of such charge was to tell the jury that such testimony could be used by them in determining the state or condition of defendant's mind at the time of the homicide.

**16.—Same—Self-Defense—Manslaughter.**

While the court should not have charged on either manslaughter or self-defense under the evidence, both were correct in form and there was no error.

Appeal from the District Court of Eastland. Tried below before Hon. S. P. Hardwicke, special judge.

Appeal from a conviction of murder in the second degree; penalty, nine years imprisonment in the penitentiary.

The opinion states the case.

*J. M. Wagstaff, D. G. Hill,* and *Hardwick & Hardwick,* for appellant.

*Howard Martin,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of nine years; hence this appeal.

The evidence on the part of the State tended to show the existence of a grudge on the part of defendant against deceased extending over a period of nearly two years, and that on the occasion of the homicide deceased and one Buck Moore were engaged in fixing the line for a fence to separate a piece of land bought by Moore from defendant through one Gillchriss, they having a day or two before notified appellant that they would move the fence, and he might be present and assist if he desired. On the morning of the homicide, which occurred in March, 1902, deceased, Frank Baccus, and Buck Moore were engaged in establishing the line for the fence between appellant's land and deceased's land, beginning at the north end and clearing the ground and driving stobs to the south end of said line. About 8 or 9 o'clock it appears that appellant and his son Arthur and one Grider went from their home, some half-mile distant, down the lane in a westerly direction, and stopped their wagon at the south end of the line, which deceased and Moore were marking out. Appellant, his son and Grider were also engaged in removing and building a fence around appellant's land down said lane. Appellant and his son remained at the end of the line with the wagon some time, Grider being at the upper end of the line. After being there a while one Forrester, who was on his way to Abilene, joined them. Not long after this, deceased and Moore came in view of the parties from the north end of the line they were marking out. The witness Forrester asked Pettis who they were, and appellant told him it was Frank Baccus and Buck Moore, deceased and Moore being then about 100 yards distant. They came on down the line, Baccus a little in advance, and having a grubbing hoe, digging holes and driving stobs with it. Moore had an ax and was clearing the way. In the meantime appellant was standing at the rear of his wagon in which he had a Winchester gun. When deceased had approached to within about thirty or forty feet of the wagon, he stopped and rested one end of his grubbing hoe on the ground, and with both hands on the handle of the grubbing hoe, looked back and across the line towards Moore, who was a short distance behind. When he did this, Pettis jerked his gun out of the wagon, and stepped in a north-

easterly direction three or four steps, stepping across the fence they were building and the old line of fence. He had his gun in a raised position, and said, "Frank, you have just scandalized my family enough," and with that he raised and fired at Baccus. At the discharge of the gun, the ball struck deceased in the stomach, and he staggered off in a northeast direction, about sixteen or eighteen feet, when appellant fired again, and deceased fell. Appellant made a third motion, and the witness kept hallooing to him to desist. Appellant stopped and turned towards witness, who asked him, "What in the world is the matter? What caused this?" Appellant said, "He has scandalized my family, and keeps on at it." Appellant then turned and walked on home. Buck Moore, the other eyewitness, for the State, testified as to the events immediately connected with the shooting substantially as did the witness Forrester. He states that when deceased walked up to within thirty or forty feet of the end of the line and turned around and looked at the stakes, his grubbing hoe was down by his side. "At that time defendant pulled his winchester out of his wagon and came from the fence, and when seven or eight steps from his wagon, maybe not that far, defendant made three or four steps after he got over the old fence, then stopped, and commenced talking to Baccus. He just said to him, 'Frank, you have disgraced my family, and you have done it on account of Buck Moore,' and says, 'God damn you, I am going to kill you.' Baccus was then facing him, the hoe in front of him and his hands on top of the handle. Pettis, after he had made these remarks to Baccus, shot deceased. Baccus hallooed, kinder doubled up, and staggered and ran back about five or six yards northwest, then Pettis shot him again. Baccus was running at the second shot. Baccus had his right arm next to Pettis when Pettis shot the second time, and he fell. At this juncture witness left the scene." Both of these witnesses testified that deceased made no demonstration with his hands, except to put them on the handle of the grubbing hoe; and both testify that they saw no arms on deceased.

Appellant testified on his own behalf as to the facts immediately attending the shooting; that he was there waiting to start building on the fence; that he did not know deceased and Moore were working on that line of fence at the time; that the old and new fence were five or six feet apart at that point; that he and his son Arthur and Forrester were there. When deceased and Moore were about seventy-five yards up the line, Forrester asked him why they were and he told him; that he kept watching them as they came on down the line. Baccus was in front a few steps, had a grubbing hoe on his shoulder, and Buck Moore had an ax on his shoulder coming on down; and Baccus walked on up within seven or eight steps and was watching appellant, and he stopped. "Just as he stopped he set the grubbing hoe down with one hand and whirled his head back at Buck, and right back on me." Defendant then sprang for his gun in the hind end of the wagon. He was within about a step of it. He grabbed the gun, and as deceased

came up he had his hand behind him. Appellant jumped over one wire there and stepped between the fences, and threw up his gun and fired, taking no sight at all, expecting either deceased or Moore to go to shooting. Fired his gun the second time just as soon as he could work the lever. Deceased was then running in a northeasterly direction; did not know he was hit until he had run four or five steps, and began to stagger, and then fell; and appellant turned and started home. He threw the shells out of his gun where he was standing. Appellant further stated that when Baccus came up, whirled around and looked back at Moore, and then looked at appellant, he though it was a signal of some kind. At that moment appellant got his gun, and when he did, deceased had his hand behind him. The reason he shot was because he was expecting deceased to shoot. He was within seven or eight steps of Baccus when he fired. If he had gotten over the second fence, he would have been within five steps of him. This is substantially the testimony of the eyewitnesses as to the facts immediately attending the homicide.

In addition to this it may be remarked that the State introduced evidence of a former difficulty between appellant and deceased antedating the homicide about twenty-two months. This was brought about on account of some alleged scandalous talk of appellant's wife about deceased's wife. Deceased and Moore went to appellant in order to settle this matter, and an altercation ensued, in which appellant proved that deceased denounced his (appellant's) wife in very vulgar and opprobious terms; and that the parties then had a difficulty in which Moore intervened and stopped them from fighting. It is also shown on the part of the State that on one or two occasions after this deceased desired to make friends with appellant and offered to make acknowledgments. They were refused by appellant. It was also shown that subsequent to this prior difficulty appellant usually went armed, carrying either a shotgun or winchester with him. There was no proof that deceased went armed, except on one occasion immediately after the difficulty he borrowed a gun from a neighbor and kept it a short time. The record fails to disclose any threat by either party, though after the first difficulty they do not appear to have been on speaking terms, but they are shown to have met along the road and in town a number of times. This is sufficient statement of the case to present the errors assigned.

Appellant made a motion for continuance which was overruled by the court, and he assigns this as error. The motion was predicated on the absence of Arthur Pettis, son of appellant. It was shown that the original indictment was presented in Taylor County, and a trial was had at Abilene at the September term, 1902, of the district court, at which Arthur Pettis testified for appellant, being at that time under subpœna. The case was subsequently transferred by change of venue to Eastland County, and on the day the criminal docket was called and the witness should have been present, and being not present, an

attachment was issued on July 9, 1903, for said witness, but that same had not been returned into court. And defendant further shows that Arthur Pettis was his son, about seventeen years of age; and that he is now informed he is in Oklahoma temporarily; that he has just recently gone there, and he did not know of his whereabouts until July 26th, having learned this fact from his wife; that until that time he believed said witness was in Texas and would be present at this term of the court. He further shows that the testimony of said witness is material; that there were only three witnesses to the homicide, other than defendant, to wit, Arthur Pettis, Buck Moore and A. L. Forrester; that said Moore and Forrester had and would testify that when defendant shot, deceased had his hands on the grubbing hoe in front of him and was making no demonstration toward defendant whatever, and that when deceased was shot he was perfectly still and looking at defendant. That witness Arthur Pettis will testify that he saw defendant shoot deceased; and that at the time he shot deceased, deceased was attempting or apparently attempting to draw a gun or pistol; that he had his right hand behind him as if he was reaching in his hip pocket for something; and that defendant never attempted to shoot until deceased made this demonstration; that said Arthur was up on the wagon, near where the homicide occurred, and in plain view of the deceased, and had a better opportunity to see the transaction than any of the witnesses; that said witness had testified, as above, at a former trial of the case, and at all times had been present until this term of the court. That appellant has been in jail since the homicide, and has had no control of the witness Arthur Pettis. This application was controverted by the State. A. B. Cunningham, deputy sheriff of Taylor County, made affidavit to the effect that on July 27, 1903, he had process for the witness Arthur Pettis, son of defendant, which he did not serve, because he could not find said witness; and on inquiry of his mother, Mrs. G. R. Pettis (wife of defendant), she told witness that Arthur Pettis was then in the Indian Territory with Mollie Bailey's show; that he made return of said process the week before said trial was set, to wit, the week before the 27th of July. There is also appended to said bill of exceptions an explanation of the judge of the District Court of Eastland County, to which is attached the affidavit of N. R. Lindsey, judge of the District Court of Taylor County. This explanation shows that shortly after the homicide a habeas corpus trial was had in which Arthur Pettis testified fully, and at that time failed to state deceased made any effort to draw a weapon at or before the time he was shot. And subsequently on the trial of said case in the District Court of Taylor County, said witness Arthur Pettis did testify that deceased did attempt to draw a weapon just before he was shot; that on said trial in Taylor County said Arthur Pettis was impeached by the district judge (Lindsey) with his statement on the habeas corpus trial; and that if said Arthur Pettis was present at this trial, he would have been impeached by Judge Lindsey. The affidavit of Judge Lindsey

fully bears out the statement made by Judge Calhoun. This affidavit shows that the witness Arthur Pettis testified on habeas corpus trial as to what occurred at the homicide, substantially as did the State's witnesses.

As to the diligence used, aside from the fact that the witness was the minor son of appellant, and presumably under his control and that of his mother, the matter of diligence would be sufficient. However, it is difficult to believe that, under the circumstances, appellant's son would be absent from a trial on which his father's life depended, unless through the connivance of the parents; and under the circumstances we would reasonably expect that some better excuse for the absence of the witness would be shown than is here presented. It is simply shown that he is absent in the Territory with some itinerant show, without any further excuse. Still we are not prepared to say that the connivance may not be on the part of appellant's wife, without any complicity of his; or the absence of the witness may be on account of his own willfulness and utter disregard of his parent's interests. It may therefore be conceded that appellant is not lacking in diligence, or rather that the State has failed to show a lack of diligence on his part.

Was the testimony of said absent witness material or probably true? We have approved the action of the trial court refusing a continuance in a number of cases in which we held that the absent testimony was not probably true; but a court should always be careful in overruling a continuance on this ground, inasmuch as the ruling may take the decision of some fact in the case from the consideration of the jury. If we are to judge this matter from the overwhelming weight of the testimony and the contradiction of the witnesses we would be inclined to uphold the action of the lower court on this ground. However, we do not believe that self-defense is in this case. Certainly there is not a squint of justification for the homicide from the State's standpoint. If we look to appellant's own testimony, it does not occur to us that the issue is raised. Appellant himself testified, as has heretofore been quoted, to the effect that when he grabbed his gun and advanced towards deceased, deceased had merely come up on the line where he was digging holes and planting stobs for the fence, and stopped, whirled around and looked back at Moore and then looked at him (defendant); that he thought this was a signal of some kind, and that at that moment he sprang for his gun. When he was advancing with this, he says, he saw deceased with his hand behind him. He then immediately began to shoot at deceased without further ceremony. We understand that the absent witness Arthur Pettis swore different at the first trial, but will now testify substantially as his father testified, to wit, that he would swear that at the time appellant shot deceased the latter was apparently attempting to draw a gun or pistol; that he had his right hand behind him as if he was reaching in his hip pocket for something, and that defendant never attempted to shoot until deceased made this demonstration. Even if the testimony of this witness went beyond his

father's in raising the issue of self-defense, it would scarcely enlarge appellant's defense, as the case must be viewed from his standpoint, from what he saw and heard, facts which authorized him to act. But we do not understand it. to go farther than the testimony of appellant himself in this regard. Looking back of the homicide itself to the events which precede it, we fail to see anything on the part of deceased or Moore to create any alarm in the mind of appellant that they would attack him on the first opportunity. There is no evidence that they were going armed for him. There is no evidence of any threats on their part against him. On the contrary, as we view the record, the acts of deceased were of a pacific character, since the altercation and difficulty they had, occurring two years previously; and as far as we are able to discover, there is nothing in the record suggesting a renewal of the strife save the recent indirect purchase of appellant's land by deceased through Gillchriss and Moore. We refer to these matters because some act or demonstration on the part of deceased which might otherwise seem trivial, in the light of surrounding circumstances might become potent, creating cause of apprehension and alarm on the part of appellant. Acts which might otherwise seem trivial may become magnified under such circumstances. But here we have nothing of the kind. Deceased and Moore had previously notified appellant they were going to mark out the line between them and inviting his presence. He knew they would be there. He went upon the ground armed with a winchester. One of his companions, Grider, on that morning, it seems, was justly alarmed because appellant proposed to carry his gun down there. After appellant got on the ground, according to his testimony and that of Forrester, he saw deceased and Moore when they were some 100 to 150 yards distant from him, coming down the line marking out the way, and he watched them. According to his testimony he saw them some 75 or 100 yards distant, and saw them watching him. According to his own testimony, when they had approached within some thirty or forty feet, deceased stopped, whirled his head around, and looked back at Moore, and then looked at appellant; and at that moment the latter sprang and grasped his gun. He says he thought it was a signal of some kind. Now, it will be noted—if it could be regarded under the circumstances as a hostile demonstration—that deceased put his hand behind him, that this was when appellant had grabbed his gun and was advancing toward deceased. It will be remarked that at this juncture appellant makes no demand or request that deceased should refrain from any hostile demonstration, if appellant regarded him as in the act of making such demonstration; but instead thereof, with a deadly weapon in his hands, which evidently enabled him to control the situation, even if deceased was making a hostile demonstration, he exclaims to deceased, according to the uncontradicted testimony of Forrester, one of the State's witnesses: "Frank, you have just scandalized my family enough," and with that raised his gun and fired. And according to the testimony of Moore, the other

eyewitness for the State, said, "Frank, you have disgraced my family. and you done it on account of Buck Moore; and God damn you, I am going to kill you." So it would appear that this was the actuating cause; that this was what caused appellant to shoot deceased. But it must be conceded that appellant says he shot him down because he believed deceased or Moore, one or both, were about to slay him. The only demonstration testified to prior to appellant getting his gun, was simply the deceased waving his head at Moore, who was some thirty or forty feet behind, which appellant considered to be a signal between them; and on this account he jumped for his gun and seized it. Now, it is true that the law authorizes a defendant to act on some demonstration that from his standpoint can reasonably be considered as a hostile demonstration. However, it is not every act of an adversary that can be reasonably construed into cause for alarm or apprehension. As has been stated, there was nothing in what had transpired previous to the homicide that could reasonably have created in the mind of appellant, when he met deceased, that he might anticipate an attack from him. Nor do we perceive, under the circumstances, how he could have magnified the act of deceased in motioning his head down the line towards Moore into a hostile act. He had watched the parties since they had appeared on the hill. He saw them in their working clothes, and must have discerned that they were without arms. The mere waving or shaking of deceased's head down the line towards Moore under the circumstances was not reasonably calculated, from defendant's standpoint, to cause him any degree of apprehension or alarm; yet on this account he seized his gun, a deadly winchester, and immediately advanced towards deceased, who was but a few steps from him, and without any warning or admonition that his enemy should desist from some act which appellant believed hostile, he pulled his gun on him and tells him he was going to kill him because he had been scandalizing his family, and immediately shot him down. We think it time that those who are inclined to kill on account of the most trivial cause should understand that it is not every act even of an avowed enemy which authorizes him to take his life. It must be some act or demonstration which under the circumstances would reasonably cause him to believe that his life was then in danger, or he was then in danger of serious bodily injury from an attack then impending and about to be made upon him. It occurs to us that to call this a killing in self-defense would be a travesty. Swann v. State, 39 Texas Crim. Rep., 310; Ditmar v. State, 8 Texas Ct. Rep., 822; Burks v. State, 49 S. W. Rep., 490. Although the learned judge who tried the case, out of an abundant caution, instructed the jury on self-defense, the law of this case did not require it, inasmuch as the evidence of appellant did not raise this issue. And the court did not err in overruling the application for continuance, because the testimony of the son Arthur Pettis was merely an echo of the testimony of his father.

Appellant by his second bill of exceptions questions the action of the

court permitting the State to prove that the general reputation of deceased in the community where he lived as being a peaceable, law-abiding citizen was good. It is contended that this action was unwarranted, because this proof could not be made unless appellant first put this matter in issue by introducing proof to the effect that deceased was a dangerous man; and that this proof is not admissible under any circumstances because, if appellant had put the character of deceased in issue as a violent and dangerous man, the State could only be permitted to show the contrary, and that "peaceable and law-abiding man" is not the converse of the proposition. We do not agree to this latter contention. We further believe that appellant had indirectly put the character of deceased as a dangerous and violent man in issue; that is, appellant had introduced evidence from himself as a witness on the stand to the effect that deceased and Moore had both told him of certain acts, conduct and other difficulties of deceased, which brought home to appellant the idea that deceased was a man of dangerous and violent character. This testimony was evidently introduced under the doctrine announced in Childers v. State, 30 Texas Crim. App., 160; Dodson v. State, 6 Texas Ct. Rep., 311. We believe under such circumstances the State had the right to prove the general reputation of deceased as being a peaceable and law-abiding man. Martin v. State, 6 Texas Ct. Rep., 267.

We believe it was entirely competent for the State to show by the wife of deceased that at the time of the homicide deceased owned no firearms and had none at home. Appellant contended, and we understand him now to contend in his brief, that the testimony was doubtful as to whether deceased was armed at the time of the homicide. The State proved that the witnesses saw no arms on him; but the contention appears to be that he might have been armed and his weapons clandestinely taken from his body. Under such circumstances we believe it was entirely competent to show he owned no firearms. This is not like the case of McCandless v. State, 57 S. W. Rep., 672, 42 State Crim. Rep., 58. Here there was no self-defense, and the testimony as has been shown served to illustrate a point.

We fail to see how it was relevant to prove that after the former difficulty between appellant and deceased, "at a trial before the justice of the peace, deceased testified, in the presence of defendant, that he used the language in regard to the wife of appellant attributed to him, and that at the time he used it he expected defendant to hit him right between the eyes. Appellant insisted on proving this fact, but we fail to see its pertinency to any issue in this case. It did not justify appellant in shooting deceased, nor do we see how it would serve the purpose of creating or increasing any apprehension appellant might have had in regard to deceased. The difficulty had long since transpired, and we fail to find any testimony in the record tending to show that deceased at any time attempted to renew it.

It does not appear to us that the court committed any error in re-

fusing to admit the proof offered by appellant to the effect that whenever he went to Merkel armed it was to some lodge, church or public gathering. Unquestionably the proof introduced by the State tended strongly to show that appellant was carrying the arms for deceased. We do not understand that the State made any effort to show that he was hunting or seeking deceased; but he seems to have carried arms wherever he went, and it was immaterial whether he was going to church or to public gatherings.

Appellant offered as a witness in his behalf one Gillchriss, who testified that he remembered the occasion of the first difficulty; that deceased came to his house with defendant, and stayed there one and a half hours; that he borrowed a double-barrel shotgun from him. In this connection appellant proposed to prove that when deceased borrowed the gun he said he wanted it to kill a dog. On objection this testimony was excluded. This appears to have been the only occasion during all the troubles between appellant and deceased in which deceased had any firearms, and this was borrowed and returned a short time thereafter. It appears from other testimony that on the same day appellant armed himself and evidently went in search of deceased. We fail to see what act of deceased at the time of the homicide this character of testimony would serve to illustrate. If it be conceded that the statement of deceased at the time he borrowed the gun was a subterfuge, and that he did not get it for the purpose of killing a dog, but for the purpose of seeking appellant in order to kill him—then this testimony transpired a long time before the homicide, and deceased is shown to have sought on several occasions and in vain to make peace with appellant. There is no evidence that at the time of the homicide he was seeking appellant, and no evidence that he was armed on that occasion. As we have seen, when he met appellant he did no act that the borrowing of a gun two years before would serve to illustrate or magnify. On the contrary, it occurs to us that this testimony would serve to intensify the animus of appellant.

While we do not believe the testimony of the witness Crawford was admissible, still it is not apparent how his experiment with the winchester, in which loaded shells were ejected therefrom, and his testimony to the effect that said winchester would only throw such shells five or six feet (though not strictly speaking admissible as testimony, inasmuch as the experiment was not performed under the same or nearly similar conditions), could have injuriously affected appellant. In the view we take of this case it is immaterial whether he crossed the second wire fence before firing, or whether he fired the shot from between the two fences. Whether he shot deceased from btween the fences or advanced across the last fence, not being justified in firing at all, no harm was done by the introduction of this experiment.

When defendant testified, he stated in effect that he did not voluntarily make an affidavit against deceased on account of the first difficulty he had with him; but that he was invited to do so by the justice

of the peace. In rebuttal, the State, over the objections of defendant, proved by said justice that the complaint was not made by defendant at his instance, but that he came to him in the streets of Merkel, and went with the justice to his office and told him he wanted to file the complaint against Baccus. Evidently appellant introduced this phase of the case for the purpose of showing that he was not pursuing deceased; that he did not even want to make a complaint against him, but that he was induced to do so by the justice of the peace. If it was material on his behalf to show this, it was equally material for the State to rebut this by showing that appellant sought the justice of the peace out and voluntarily made the complaint against deceased. We fail to see how a date given by the justice of the peace different from that given by appellant could prove hurtful to him. It appears that the justice incidentally stated it was on the 18th instead of the 17th of June that the matter occurred. The only material point was the fact that the complaint was made voluntarily and at appellant's own solicitation, and not on account of any request or demand by the justice.

The testimony of the witness Grider on cross-examination, that in a conversation with appellant that morning when appellant requested him to go with him down to fix a fence, and appellant got his winchester and put it in the wagon, the witness in that connection remarked to him, "If you are going to have use for that gun I had better not go up there." This testimony was objected to by defendant on the ground that the same was a conclusion and opinion of the witness, and defendant should not be bound thereby, and is not the statement of a fact, etc., which objections were overruled by the court. This bill does not show the connection in which this testimony was introduced. If it was in the course of a conversation between appellant and Grider with reference to putting a gun in the wagon, it was doubtless admissible. A recurrence to the testimony of this witness shows that he testified in that same connection that it was in a conversation with appellant; and appellant stated in reply to this witness that "Maybe I had better work on that other string of fence." This witness further stated that the reason he made the remark was that he thought deceased and Moore might raise a racket with appellant, as they had done before, alluding to the prior difficulty. We fail to see how any injury could accrue to appellant on this account.

We make the same observations with reference to the testimony of the witness Dulen, who testified in regard to the original difficulty and stated that he had a conversation "with defendant and asked him if he and Baccus could not settle the trouble; that none of us wanted to go to court, and asked him if he could not drop it. Defendant said if he dropped it they would hatch up something else. That he had two such conversations, the first one three weeks or more after the first difficulty, and the second one a week or two after the first. Defendant said, 'By ganny, they have started to prove this thing now, and just let them prove it,'—referring to the tale that had been circulated by his wife.

That he told Pettis that he came at Baccus' request and told him that Baccus asked him to see if he was willing to take acknowledgments, that he was willing to make all acknowledgments, and that he (Baccus) was sorry for the remarks he had made about his wife, and was willing to make all acknowledgments that was reasonable for him to make. And that Pettis said he didn't want any acknowledgments; and the witness Dulin replied, 'That's all a man can do.' " The last sentence in this evidence is objected to on the ground that it was hearsay and self-serving declaration on the part of Baccus, and was an opinion and conclusion of the witness Dulin, and defendant should not be bound thereby. This was a conversation between appellant and the witness Dulin; and his remark after appellant refused to take any acknowledgments from Baccus, to the effect, "That's all a man can do," while strictly speaking was the expression of an opinion by the witness to appellant, still it was obviously a proper construction by witness made to appellant as to the tender of an apology by deceased to him. Appellant made no reply to this, so far as the record discloses, evidently agreeing to the proposition. The only harmful matter that came before the jury in this connection was when appellant refused to make peace or accept an apology from deceased; and no doubt this was admissible.

On the trial appellant proposed to prove by his wife that she was not the originator of the talk about Mrs. Baccus, the wife of deceased; that she as a matter of fact had never started or circulated such slanderous talk. This was excluded by the court on the ground that it was irrelevant and immaterial, and tended to elucidate no issue in the case. As stated before it was shown without controversy in regard to that first difficulty, that deceased proposed to apologise, regardless of the right or wrong of appellant's wife in circulating such slanderous reports. Deceased condoned the matter, and more than this, attempted to make his acknowledgments both to appellant and his wife. While this matter was the origin of the difficulty, and evidently constituted the cause of the grudge on the part of appellant towards deceased, yet the truth or falsity of appellant's wife being the originator and circulator of said reports, in our opinion would serve to shed no light upon the issue here involved. The court did not err in excluding the testimony.

Nor do we think that it would serve any useful purpose to have admitted the proof offered through Corning to the effect that some month or two before the homicide he heard deceased say in Merkel, referring to the troubles between himself and defendant, that defendant was an old coward and would not fight. It was not proof of any threat by deceased, and such proof would have neither illustrated nor accentuated any act by deceased towards appellant at the time of the homicide.

We do not think the court committed any error in regard to the re-examination of appellant after he had been cross-examined by the State. Of course, appellant's counsel had a right to confer or consult with him at all reasonable times; but after he had gone upon the stand it was

within the discretion of the court, until his examination was completed, to refuse to allow his counsel to consult with him; unless it was upon some matter that was important in the interests of justice, which should have been made known in the bill of exceptions. The conduct in the examination of witnesses is greatly in the discretion of the court, and unless there appears some abuse of that discretion it will not constitute error.

Appellant excepted to certain charges of the court. Among other things he says that the court erred in the charge as to the effect to be given to previous quarrels, altercations and menaces on the part of Frank Baccus, deceased, toward appellant. The effect of this instruction was to tell the jury that such testimony could be used by them in determining the state or condition of defendant's mind at the time of the difficulty that resulted in the killing of deceased. We understand that to have been the purpose of the testimony; not to indicate the state of mind of deceased, but as testimony tending to show any cause of apprehension on the part of appellant; how his mind was affected thereby. In this there was no error.

Appellant further criticises the court's charge on self-defense. We have examined the court's charge, and it appears to be a correct charge applicable to a case where the issue of self-defense was involved; but as heretofore stated there was no self-defense in this case. We make the same observations with reference to the court's charge on manslaughter. That is apparently a correct charge on that subject; but we fail to see any manslaughter in the case.

The jury found appellant guilty of murder in the second degree, and they were amply warranted in this finding. In fact, the result of their verdict, giving appellant only nine years in the penitentiary, was exceedingly lenient on their part; and in our opinion appellant should entertain a sense of gratitude for the ability displayed by his counsel in the management of this case, in reducing what under the ordinary rules of law is murder in the first degree to murder in the second degree with a penalty of only nine years; and should also entertain a sense of gratitude to the jury for their great clemency in giving him such a light verdict. The judgment is affirmed.

*Affirmed.*

[Motion for rehearing overruled without written opinion.—Reporter.]

DAVIDSON, PRESIDING JUDGE (Dissenting).—My brethren have affirmed the judgment, holding that the question of self-defense was not suggested by the evidence. To this I can not agree. Whatever this court may think or whatever the jury may have thought or the trial court may have thought about the cogency or truthfulness of the testimony, the facts set out in the application for continuance expected to be shown by the absent witness do suggest the theory of self-defense. Defendant testified to the self-defensive theory, and if the testimony

of his son had been before the jury that theory would have been decidedly strengthened. It seems that on a previous trial the son did testify before the jury, and they failed of conviction. I do not care to enter into a review of the record, as it is very voluminous, and the opinion states with sufficient fairness the main facts of the case. An inspection of the facts as set out in the opinion of the majority show with sufficient cogency, in my judgment, that the issue of self-defense was in the case. The trial court so believed, and in deference to that belief charged the jury in regard to the issue. This was the first application, and so the question of cumulative testimony could not be considered. That the motion to continue ought to have been granted it seems to me is more urgent by reason of the fact that the defendant, being the interested party, alone testified to his defensive theory. His son was an eyewitness, and while he might be considered by the jury as also interested in the outcome of the trial, and therefore testifying in behalf of his father, still where a defendant is his only witness on an important issue, and other testimony can be secured to the same effect, the application for continuance ought not be judged as critically as where defendant is not forced to rely upon his own testimony. The record is without question that the absent boy was an eyewitness to the killing and saw the whole transaction, because the eyewitnesses for the State place him at the scene of the homicide, and in close juxtaposition to his father and the whole transaction. It is conceded, as I understand this record, that the boy would have testified to the facts set out as he had already done so on a previous trial. It occurs to me that wherever a man is being tried for his life or liberty under the circumstances detailed in this record, he at least should not be forced, over his application for continuance, to go before the jury until he has had reasonable opportunities of having his testimony; especially so when the testimony comes from an eyewitness to the transaction and is directly opposed to that introduced by the State. Appellant was legally entitled to have this testimony before the jury, and to be weighed by them in passing on his guilt or innocence of the homicide.

There is another question that occurs to me ought to reverse the judgment. Back of the homicide, leading along up to it, ill feeling is shown to have existed between defendant and deceased in regard to some reports about the wife of deceased, which reports were imputed to the wife of appellant. The record is bristling with this testimony as being the cause of much of the trouble between the parties. There had been criminations and recriminations, discussions, explanations, fights and litigation and ill will, more or less hot blood engendered on account of it. In this attitude of the case appellant offered his wife as a witness to prove by her that she did not originate and make the statement imputed to her, but she was not permitted to testify. I think this was most clearly error. These matters had already been used before the jury against accused, and now when he seeks to explain them or enter denial, he is not permitted to do so. I had been under the impression

that it was a fundamental principle of evidence, where one party introduces damaging evidence against the other, the party against whom it was introduced could meet it with any legal testimony at his disposal to show the falsity of the evidence adduced against him, or to explain it away or to modify and weaken its force and strength. Therefore I think the wife should have been permitted to testify to the matters sought to be elicited from her. For these reasons I think this judgment should be reversed.

Filed June 10, 1904.