(No. 2763.    April 11, 1923.)

.STATE v. TODD.

SYLLABUS BY THE COURT.

(1) Evidence of specific acts of deceased, when admissible, tending to show his violent and dangerous character, authorizes the state, on rebuttal, to show his general reputation to be good in that regard.                    P. 519

(2) A threat, made only a short time before the homicide and under such certain circumstances, as to point with reasonable certainty to the deceased, is admissible against the defendant.                    P. 524

(3) When the language of the defendant is susceptible of two construuctions, one that it is a threat against the deceased, and one that it is a declaration by defendant of his intent and ability to defend himself against any assault by the deceased, the same is admissible in evidence, and the meaning is for the jury.                    P. 526

(4) Language of the defendant showing the state of feeling between him and deceased is ordinarily admissible.
                    P. 526

(5) When a character witness discloses that he does not know the general reputation of the person testified about, but is speaking only from his own personal knowledge of the person, his evidence may be stricken out on motion. person, his evidence may be stricken out on motion.     P. 527

(6) A hypothetical question to a medical expert examined in connection with the evidence in the case, and held to be proper.                                                          P. 527

(7) The requested instructions of defendant examined, and held to be properly refused; they being sufficiently covered by the court's general instructions.                        P. 527

(8) A requested instruction, upon a theory not presented to the jury by the evidence for the defendant, is properly refused.                                                         P. 531

Appeal from District Court Curry County; Bratton, Judge.

James Todd was convicted of murder in the second degree, and he appeals. Affirmed.

Rowells & Reese, of Clovis, and Albert Morgan, of Portales, for appellant.

H. S. Bowman, Atty. Gen., and Patton & Hatch, of Clovis, for the State.

OPINION OF THE COURT.

PARKER, C. J.   The appellant was convicted of murder in the second degree and was sentenced to the penitentiary, and has appealed.

[1] In rebuttal the prosecution introduced evidence of the good reputation of the deceased as to peace and quietude. Appellant assigns error in the action of the court in admitting this proof. The argument in support of the assignment is that there was no evidence introduced on behalf of the defendant attacking the character of the deceased in this regard, and that therefore the proof offered on behalf of the prosecution was inadmissible. Counsel agree to the general rule that evidence of the good character of the deceased in a homicide case is inadmissible, unless his character has been put in issue by the defendant. The controversy between counsel, however, is as to whether the character of the deceased was put in isssue in such a way and to such an extent as to authorize the proof which is objected to. It appears from the transcript

that a large amount of testimony was produced by the defendant which showed the violent character of the deceased. The appellant himself testified that the deceased was a high-tempered man, and had told defendant that if he did not quit meddling with deceased's business he would blow his brains out; that deceased had his gun with him at the time; that later the deceased in the nighttime attempted to murder the appellant and his whole family by the use of chloroform; that deceased on another occasion laid in wait for appellant and had told him that he was going to kill him; that he habitually carried a gun when he came around the place where appellant lived, and that he had never theretofore carried a gun so far as appellant knew; that appellant moved away from the place where he was living with his family in order to avoid trouble with the deceased. The wife of the defendant testified that the deceased was quick tempered, and that he was the cause of all the trouble with her husband; that the deceased threatened the appellant to her, and said he was going to kill him; that she and her husband moved away from their home to another place because she saw there was trouble and that they thought it best to get away; that the deceased had tried to chloroform her along with her husband. The little son of appellant testified to seeing his uncle, the deceased, around his fathers's place on several occasions with a shotgun, and that on one occasion the deceased made a threat against the appellant. Other testimony of a similar import is to be found in the record, and was introduced for the purpose of demonstrating that the deceased was a danger·ous and violent man, and for the purpose of demonstrating that the appellant, when he fired the fatal shot, was justified in taking the same into consideration in determining whether it was necessary for him to kill. This proof clearly put in issue the character of the deceased as a man of peace and quietude, or as a man of violent and dangerous character.

The argument is put forward that inasmuch as no general evidence was produced in behalf of the

appellant as to the reputation of the deceased for peace and quietude, or otherwise, proof of good character by the prosecution in rebuttal was inadmissible. This is an erroneous view of the law.

In the first place, it may be said that there could be no valid reason for a distinction between an attack upon deceased's character by evidence of general reputation and an attack by proof of specific threats and acts of the deceased, when they are admissible as in this case. Here deceased has been characterized by the appellant as carrying a gun for him, lying in wait for him, attempting to murder him and his family by the use of chloroform, and threatening to murder him. Deceased's character has been thus attacked and blackened as successfully as could possibly have been done by calling his neighbors in to testify to his bad character. Hence it is to be found that no such distinction as counsel for appellant seeks to draw is recognized by the better considered cases, and by the text-writers. Thus it is said by Mr. Wharton:

"Evidence of general reputation for violent or bad character upon the part of the deceased, is not essential in a prosecution for killing him, to constitute an attack upon his character which will render admissible evidence of his good character." Wharton on Homicide (3d Ed.) § 270.

In People v. Gallagher, 75 App. Div. 39, 78 N. Y. Supp. 5, the court said:

"Evidence of the bad character of the deceased for quarrelsomeness and vindictiveness is always competent where self-defense is alleged, and an issue with reference thereto is presented by the evidence, and it seems to us to be immaterial in what manner the attack upon the deceased's character is made, whether by evidence of general reputation or by any other species of evidence. If the issue is raised by defense at all, the people may meet it by evidence of general reputation as to good character."

In Hussey v. State, 87 Ala. 121, 6 South. 420, the court said:

"There was no error in allowing the state to prove the good character of the deceased for peace and quiet. The ground of objection to this evidence seems to be, that the

general reputation of the deceased had not been put in issue, but only the particular traits of his character as a quick-tempered, violent man, easily provoked, and likely to provoke a difficulty. If these traits of disposition are provable at all—which we do not decide—they are not separable from the question of character."

In State v. Vaughan, 22 Nev. 285, 39 Pac. 733, the court said:

"The prosecution was permitted in rebuttal, over the defendant's objections, to introduce testimony to prove that the character of deceased for peace and quietness was good. It is argued that this was error, because his character had not been attacked. But there may be such attacks as will authorize the admission of evidence of good character without any witness having testified directly that the reputation of the attacked party was bad, and that seems to be the case here. The defendant, and others in his behalf, had testified to many facts tending to show that the deceased possessed a quarrelsome, turbulent and violent disposition; that he was in the habit of using very bad language towards the defendant and his family; that he had frequently made threats against them, including defendant; that upon one occasion he had wantonly shot at him, and at the time of the homicide was making a murderous assault upon him. We think this was equivalent to proving his character as a quarrelsome, turbulent, and violent boy, and fully justified the admission of the evidence of good character in rebuttal."

In State v. Lejeune, 116, La. 193, 40 South. 632, in answer to the question, "Was he not a shootist?" a witness for the defense answered that the deceased had been in several shootings and had got shot. In rebuttal the state offered to prove the good character of the deceased, and the court said:

"In the opinion of the court the question was intended to show the bad character of the deceased for peace and quiet, and the state had the right to offer countervailing proof. The correctness of this ruling is too plain for discussion."

In Pettis v. State, 47 Tex. Cr. R. 66, 81 S. W. 312, the court said:

"We further believe that appellant had indirectly put the character of deceased as a dangerous and violent man in issue; that is, appellant had introduced evidence from himself, as a witness on the stand, to the effect that deceased and Moore had both told him of certain acts, conduct, and other difficulties of deceased which brought home to appellant the idea that deceased was a man of dangerous and

violent character. * * * We believe, under such circumstances, the state had the right to prove the general reputation of deceased as being a peacable and law-abiding man."

See, also, in this connection, State v. Feeley, 194 Mo. 300, 92 S. W. 663, 3 L. R. A. (N. S.) 351, and note page 368, 112 Am. St. Rep. 511, where the above cases and others are collected; also, State v. Thompson, 49 Or. 46, 88 Pac. 583, 124 Am. St. Rep. 1015, and note at page 1035; also, 13 R. C. L., "Homicide," § 219.

In Thrawley v. State, 153 Ind. 375, 55 N. E. 95, the extreme view is taken on this subject to the effect that where the defendant pleads self-defense and intro-duces evidence for the purpose of showing an apparently felonious assault upon him by the deceased at the time of the homicide, the state may in rebuttal prove the good character of the deceased for peace and quietude.

Our own court has considered this question in State v. Johnson, 24 N. M. 11, 172 Pac. 189, and , under circumstances where the ·character of the deceased was attacked in a much milder way than in the case at bar, we held that the prosecution might offer in rebuttal evidence of the good character of the deceased. In State v. Bailey, 27 N. M. 145, 198 Pac. 529, the defendant on cross-examination sought unsuccessfully, to elicit facts which would show that the deceased was a quarrelsome and violent man. The evidence complained of in that case was upon redirect examination of the same witness and merely explained and amplified the matters brought out on cross-examination. This case, therefore, has no direct bearing up·on the point at issue here. The above cases are the only two cases which have been before this court upon this subject, and the Johnson Case is clearly authority for the admission of the testimony complained of in the case at bar.

It is plainly to be seen that the character of the deceased was purposely put in issue by the defendant in the trial of the case. It was necessary for the de-

fendant to show these facts in order to sustain his plea of self-defense. The deceased was unarmed at the time he was shot by appellant, but was leaning into the automobile and apparently raising the cushion from the front seat and procuring a pistol from the automobile, according to the testimony of the appellant. He had made no threat at the moment against the appellant according to appellant's own testimony, and it was necessary to show the hatred and violent character of the deceased in order to make any showing whatever of justification for the appellant, and it was for this purpose that all of the proof heretofore mentioned was put in by appellant. Under such cir cumstances there can be no doubt that the prosecution had the right on rebuttal to prove the character of the deceased as a man of peace and quietude.

[2] Appellant complains of the admission of the testimony of a witness tending to show a threat on the part of appellant against deceased. The ground of objection is that the language used was indefinite, the name of the deceased not being mentioned. It appears that appellant had children who were conveyed to and from central school in the school truck. They had suffered what was considered by appellant mistreatment while riding in the truck. On the morning of the homicide at 7 o'clock appellant met the witness Young, and the following occurred, according to the witness:

"Q. State if you saw the defendant on the morning of the 23rd day of November, last year? A. Yes sir; he came to my house that morning.

"Q. About what time? A. About 7 o'clock.

"Q. And how far did you say you lived from the St. Vrain school? A. Four miles north, three west, and a quarter north.

"Q. Did you have a conversation with the defendant at that time and place relative to any purported trouble in school? A. Yes, sir.

"Q. Just state what was said by the defendant? A. He said his children were being mistreated on road and he was going to St. Vrain to see about it, and if his children didn't have justice there would be serious trouble.

"Q. State whether or not there was any oath used by the defendant in connection with the words.    A. He said, 'By God, his children was going to have justice or there would be serious trouble.'

"Q. Where did Todd go after he made the statement that you say he did in which he used the words 'By God, there would be serious trouble'?    A. He went towards St. Vrain.

"Q. How did he leave?    A. He left on horseback—riding a horse.

"Q. When was that with reference to the time James Roy was killed?    A. That morning about 7 o'clock, or maybe 7:15, the morning before James Roy lost his life about 9 o'clock."

It further appears that James Roy, the deceased, had the contract to transport all of the children to and from school, but that he had sublet a part of the contract covering the route over which the children of the appellant traveled.    It further appears that the appellant went almost directly to where the deceased was buying gasoline for his school truck and the fatal difficulty occurred.    Upon arriving where the deceased was, he said to the deceased:

"I have a little trouble to make with you this morning. You can take it or let it alone.    My children are getting to where they won't hardly ride with Mrs. Davis at all."

To this statement the deceased replied, after getting out of the truck where he was pouring gasoline in the tank:

"I don't think the trouble is with the children, I think it is in you."

The deceased then turned and leaned into the school truck from which he had alighted, and the appellant shot him.    The appellant, when he shot, said:

"You damned son of a bitch!    You can't pull anything like that on me, when you have been carrying a gun for me for over a year."

This same question was presented to this court in State v. Bailey, 27 N. M. 145, 198 Pac. 529, in which all of the New Mexico cases are collected.    From these cases and those cited, it is apparent that the rule in this jurisdiction is that a threat, of an indefinite nature,

in that the name of the person against whom the threat is made is not mentioned, is nevertheless admissible, where, as in this case, it is made only a short time before the homicide, and is made under such surrounding circumstances as to point with reasonable certainty to the deceased.

[3]. Objection is made to the testimony of the witness Dernell which is as follows:

"Q. What was said by defendant in that conversation? A. Mr. Todd told me he understood Mr. Roy was carrying gun for him, and he said, 'I have got a good one,' and reached in behind the seat and got a gun. He had it covered up with the laprobe, and he reached in and 'pulled the gun out and showed it to me and held it up, and said: 'By God, that will get him. I understand Jim Roy is carrying a gun for me, but, by God, that will get him.' and held the gun up where I could see it."

This language was clearly susceptible of an interpretation constituting it a direct threat against the deceased. The appellant stated that the gun which he showed the witness would get the deceased. Of course, the language is susceptible of another construction to the effect that if the deceased assaulted him with the gun which he was carrying, the appellant would be able to defend himself successfully against any assault by the deceased. But the true meaning of the words was for the determination of the jury, taken in connection with all of the circumstances. For this reason the testimony was admissible.

[4] The witness Clovis Davis testified as follows:

"Q. What was said by the defendant at that time, Mr. Davis? A. Well, he made the remark this way to me that he said it was a good thing Mr. Roy didn't come on up to where he was, and said that if he had come on up he would have used the neck yoke on him."

Objection was interposed by counsel for appellant upon the ground that the conversation referred to a past transaction, and was not in the nature of a threat to be executed in the future. It does not follow, however, that the testimony was inadmissible. It characterized the state of feeling on the part of the appellant towards the deceased and was not so remote in time

as to be immaterial. Upon this subject, see Hurley v. Territory, 13 Ariz. 2, 108 Pac. 222, wherein it is said:

"It is alleged that the court erred in permitting the witness Ralph King to testify, over objection of the defendant, to a conversation between the defendant and the witness at a period prior and remote to the homicide, in regard to what the defendant had said about the pointing of a gun and threatening to shoot the children of the deceased. The court allowed the testimony to stand over the objection of the defendant upon the theory that, in connection with other conversations and threats of the defendant as testified to, it might have significance as indicating a continuance of the state of mind of the defendant towards the deceased. We think the testimony was admissible; the weight to be given to it being as the court stated, a matter for the jury to determine."

See, also, 13 R. C. L. "Homicide," § 216.

[5] A witness testified in regard to the appellant's reputation as to being a quiet and peaceable citizen and stated that it was good. Upon cross-examination the witness disclosed that he did not know the general reputation of the appellant in the community in which he lived, but that he was testifying as to what he knew personally himself regarding the matter. Upon motion of the district attorney the testimony was stricken out, and appellant assigns error thereon. That the action of the court was correct there can be no doubt. The character of the defendant in a criminal case can ordinarily be established only by proof of his general reputation in the community in which he lives, and when a witness called to establish his good character discloses that he has no knowledge of his general reputation in the community, his testimony should be stricken out. State v. Sedillo, 24 N. M. 549, 174 Pac. 985; State v. Stewart, 6 Pennewill (Del.) 435, 67 Atl. 786; People v. Turney, 124 Mich. 542, 83 N. W. 273; People v. Ward, 134 Cal. 301, 66 Pac. 372; People v. Van Gaasbeck, 189 N. Y. 408, 82 N.E. 718, 22 L. R. A. (N. S.) 650, and note, 12 Ann. Cas. 745.

[6] Counsel for appellant complain of the failure of the court to sustain an objection to a question propounded to a medical expert as to the quantity of chloroform necessary to produce a stupor the chloro-

form being poured upon the open floor in a certain described room. The objection was based upon the assumption that there was no evidence in the case upon which to found the the hypothetical question. In this counsel are in error. The wife of the appellant had testified as follows:

"I was asleep, and it just seemed like I tried to wake up. I can't tell exactly my feelings. I know it was chloroform. It seemed like I couldn't do what I. wanted to, and I tried to call Jim. I don't know whether I spoke or not, but after so long a time I got to where I could move, and I shook him and told him the house was full of chloroform, and we both got up, and I went into the other room for a light, and when I got back he was standing there in the door."

The question propounded to the doctor was:

"State what amount it would take, poured into such a room as the one described upon the open floor, to produce a stupor to where you would lose control of yourself?"

It is apparent by comparison of the testimony with the question that it was well within the scope of the facts shown.

[7] The court in explaining the law of self-defense gave to the jury instructions Nos. 17 and 18, which are as follows:

"The defense interposed in this case by the defendant is that he killed the deceased in his self-defense. In this connection I charge you that a person may repel with force in the defense of his person against one who manifestly intends and endeavors, by violence, to take his life or do him great bodily harm, and if a conflict ensues from such circumstances and life is taken, the killing is justifiable. To justify the killing, however, there must be an apparent design on the part of the assailant either to take the life of the person assailed, or to inflict upon him some great bodily harm, and in addition to this there must be then and there imminent or apparent danger of such design or purpose being carried out. The law of self-defense does not imply the right of attack, nor will it permit acts to be done in retaliation or for revenge.

"If a person is assailed, being himself without fault, and at a place where he has a right to be, and for a lawful purpose, and has reason to apprehend great harm to himself unless he kills his assailant, the killing is excusable. If you find and believe from the evidence that the deceased, just prior to the time the defendant fired the fatal shot, if he

did, made some act or demonstration in such a manner to, and did cause the defendant, as a reasonable man to believe, and if you find and believe that he did in good faith believe, that he was in imminent danger of losing his life or suffering great bodily harm at the hands of the deceased unless he killed him, and while so believing the defendant shot and wounded the deceased, from which wounds he thereafter died, if he did, then under such circumstances he is entitled to invoke the law of self-defense. In this connection a person who is attacked is entitled to judge the danger to himself from the conditions and circumstances as surround him, and if, as a reasonable man, he believes that he is in danger of losing his life or suffering great bodily harm, he is entitled to act upon the conditions and circumstances as they then appear to him. It is not necessary that there be real or actual danger, but there must be such conditions and circumstances surrounding the defendant as would cause a reasonable man to believe in good faith that actual or apparent danger to life or limb existed at the time. Apprehension of danger to justify a homicide should not be based upon surmises alone, but there should be coupled therewith some act or demonstration on the part of the person from whom danger is apprehended evincing an immediate intention to carry such design or purpose into execution, and you should judge of the reasonable grounds for such apprehension on the part of the defendant from all the facts and circumstances as existed and surrounded him at the time of the killing."

Counsel for appellant did not except to the instructions of the court, but tendered various instructions, the first of which is as follows:

"The court instructs the jury that the real issue raised in this case by the plea of self-defense is whether, at the time the fatal shot was fired, the defendant believed, and had reasonable grounds to believe, that he was in imminent danger of death or great bodily harm, and it not necessary that you find the defendant to have been in actual danger at the time he fired; but if you find from the evidence that he was in apparent danger of death or great bodily harm at the time he fired the fatal shot, then his act was justifiable, and in determining whether or not the defendant was in apparent danger you are to view the circumstances at the time as they appeared to the defendant as a reasonable man situated as he was at the time."

Counsel on both sides agree to the general doctrine that a defendant on trial for murder is entitled to have his theory of the case fairly presented to the jury, and they likewise agree that it is not error to refuse to give a requested instruction when the subject-matter of the same is fairly presented in the court's general instructions. In the case of appellant's requested

instruction No. 1, when compared with the court's general instructions, it is apparent that the requested instruction was properly refused.  The argument is made in the brief that the court limited the defense to actual danger and excluded from the consideration of the jury the question of apparent danger.  An examination of instruction No. 18 above quoted will show that in this counsel for appellant are mistaken.  The subject of apparent danger is fully covered by the court's instruction No. 18.

The same thing may be said of appellant's requested instructions Nos. 2 and 3.  Also of requested instruction No. 4, the latter part of which is as follows:

"I further charge you that if the testimony in this case in its weight and effect be such that two conclusions can be reasonably drawn from it, the one favoring the defendant's innocence, and the other establishing his guilt. the law makes it your duty to accept the conclusion tending towards innocense, rather than the one tending towards guilt."

This matter of the weight and effect of the evidence, and the presumption of innocence, is fully covered in the court's instruction No. 2, although in somewhat different language from that presented by the appellant.  The instruction, however, fully presents to the jury that the presumption of innocence remains with the defendant throughout the trial until it has been removed by evidence satisfying the jury of defendant's guilt beyond a reasonable doubt.  This is all that the defendant is entitled to on this subject.

Appellant presented his requested instruction No. 5 on the subject of threats by the deceased against the defendant, and it directs the jury that they are entitled to consider the threats in connection with the other evidence in determining who was probably the aggressor, and in determining what apprehension might reasonably arise in the mind of the defendant from the conduct of the deceased.  This whole subject was completely covered by the court's instruction No. 19 in practically the same language as requested instruction No. 5.

[8]    Appellant finally complains of the refusal to give his requested instuction No. 6, which is based upon a theory not supported by the evidence for the appellant.   He testified that he acted, not upon appearances, but upon facts, and that he saw the deceased reach into the car, get a pistol with his left hand, and change it to his right hand before he fired the fatal shot.   Requested instruction No. 6 is based upon an entirely different theory, and is to the effect that the appellant was justified in acting upon appearances, and that the defendant had a right to act upon them, even though the deceased had no pistol or gun in the automobile or truck.   The appellant, therefore, had no right to insist upon submitting such an issue to the jury.

We have carefully examined the entire record in this case and find no reversible error therein.   Counsel for appellant are to be commended for their zeal and industry in presenting every possible consideration looking to a reversal of the case, and the appellant has had everything done for him which could possibly be done.

It follows from all of the foregoing that the judgment of the district court is correct and should be affirmed, and it is so ordered.

BOTTS, J., concurs.

BRATTON, J., having tried the case below, did not participate in this decision.