(75 App. Div. 39.)

### PEOPLE v. GALLAGHER.

(Supreme Court, Appellate Division, Fourth Department. July 8, 1902.)

1. MURDER—SELF-DEFENSE—REPUTATION FOR PEACEABLENESS—ADMISSIBILITY OF EVIDENCE.

Where to a prosecution for murder in the first degree defendant pleaded self-defense, and sought by various evidence to show that deceased was quarrelsome, morose, irritable, and vindictive, and subject to violent outbursts of temper, and in the habit of making threats against defendant, the fact that defendant offered no evidence to show that deceased's general reputation for peaceableness and good disposition was bad did not render it improper to allow the prosecution's witnesses to testify that such reputation was good.

2. SAME—MOTIVE—PRIOR CONVERSATION.

Where it appears that on the night of a murder a woman stated to the accused that "he ought to lick [deceased], or he was no friend of hers," and that after this remark accused left the woman, borrowed a revolver, and went to a saloon where the deceased was, and, after commencing conversation with him, shot him in the affray which followed, evidence of the woman's statement is competent as showing motive, and as bearing on the whole transaction at the time of the shooting.

3. SAME—WEAPON—POSSESSION BY JURY—GROUND FOR NEW TRIAL.

Code Cr. Proc. § 425, provides that the court may permit the jury, on retiring for deliberation, to take with them any paper or article received in evidence, but only upon consent of defendant and counsel for the people. Section 465 gives the court power to grant a new trial where the jury has been guilty of misconduct by which a fair and due consideration of the case has been prevented. Held, in a prosecution for murder, that the fact that the jury were allowed, without the consent of defendant's counsel, to have the revolver with which the crime was committed in the jury room while deliberating on their verdict, did not authorize a new trial; it appearing that the sheriff, at the jury's request, took the revolver from the court room in the absence of the presiding justice and of counsel for both sides and of the defendant himself, and delivered it to the jury, under the mistaken notion that counsel had agreed that the jury might have it if they so desired; and it also appearing that the examination of the revolver did not affect the verdict, or prejudice the defendant in any way.

Appeal from trial term, Cayuga county.

James G. Gallagher was convicted of manslaughter in the first degree, and from such conviction, and from an order denying his motion for a new trial on the minutes, he appeals. Affirmed.

Argued before ADAMS, P. J., and McLENNAN, SPRING, and WILLIAMS, JJ.

E. C. Aiken, for appellant.

Harry T. Dayton, for respondent.

¶ 1. See Homicide, vol. 26, Cent. Dig. § 397.

WILLIAMS, J. The judgment and order appealed from should be affirmed, and the case remitted to Cayuga county, pursuant to section 547 of the Code of Criminal Procedure.

The defendant was indicted for the crime of murder in the first degree in having caused the death of George Beibert by shooting him on the 29th day of July, 1901, at the city of Auburn. Upon his conviction he was sentenced to Auburn state's prison for 15 years. There was no dispute but that the defendant caused the death of the deceased. The defense was that the killing was justifiable or excusable homicide; that it was accidental, and while defendant was acting in self-defense. The jury found that the killing was without intent to cause death, and was not, therefore, murder in either the first or second degree. They found it was not accidental, or in self-defense, and therefore, having been caused by a dangerous weapon, was manslaughter in the first degree. It took place about 11 o'clock at night, in White's saloon, during an affray between the parties. The only person present and who saw the transaction was the bartender, Fred Leader. The deceased was a hack driver, and the defendant was a man about town. Both were accustomed to frequent this saloon. They appear to have had relations with houses of ill fame, and to have been quite unfriendly prior to the occasion in question. The defendant borrowed the revolver, and went immediately to the saloon, knowing the deceased was there. He commenced a conversation with the deceased on entering the saloon. An altercation resulted, and there was a clinch and a struggle, during which the revolver was twice discharged, the second shot causing the death. Between the two shots the defendant struck the deceased two or more times with the revolver upon the head. He claimed that the first discharge of the revolver was intentional, but above deceased's head, for the purpose of frightening him, and that the second discharge was unintentional, while he was striking the deceased with the revolver, in self-defense. A great deal of evidence bearing upon this question, direct and circumstantial, was given, which need not be referred to in detail here. The court, in a very fair and impartial charge, submitted to the jury the questions of fact involved in the case. We have carefully examined the evidence given upon both sides contained in the record, and have no doubt that the verdict rendered was justified by the evidence before the jury, and considered by them. The only questions, therefore, for our consideration upon this appeal, relate to errors alleged to have been committed during the trial and appearing in the record of the trial, and in denying the motion for a new trial.

1. It is said that it was error to receive evidence of the character of the deceased when the defense had offered no evidence on that subject. After the close of the evidence for the defense, several witnesses were called in behalf of the people, and testified under objection and exception that the general reputation of the deceased, by the speech of people, for peaceableness and good disposition, was good. After this evidence was given, a motion was made by defense to strike it out, which was refused, with exception. No evidence of general reputation as to the bad character of the deceased in these respects was given by the defense. The defense had, however, by various kinds of evidence,

sought to show that the deceased was of a quarrelsome, morose, irritable, vindictive disposition, and subject to violent outbursts of temper, and the making of threats against the defendant. In this manner the good character of the deceased for peaceableness and good disposition had been assailed and attacked, and the question is whether, by reason thereof, the evidence of general good reputation complained of was proper. In Thomas v. People, 67 N. Y. 218, 223, the defendant gave evidence tending to show that the general character of the deceased was bad; that he was very quarrelsome and vindictive. The people were then allowed to give evidence in rebuttal, tending to show that his character as to quarrelsomeness and vindictiveness was good. The court held that the defendant, having attacked the character of the deceased, and thus opened the issue, could not complain that evidence was received on both sides of it. It does not appear by the report of that case whether self-defense was alleged, but apparently it was, because there would have been no occasion otherwise to give the evidence on either side, or to raise the issue as to character. Evidence of the bad character of the deceased for quarrelsomeness and vindictiveness is always competent where self-defense is alleged, and an issue with reference thereto is presented by the evidence, and it seems to us to be immaterial in what manner the attack upon the deceased's character is made, whether by evidence of general reputation or by any other species of evidence. If the issue is raised by defense at all, the people may meet it by evidence of general reputation as to good character. There seems to be no authority directly upon this point, but the conclusion we have arrived at seems to be reasonable and correct.

2. It is said that it was error to receive evidence of inflammatory declarations made to the defendant by third parties, to which he made no response. The only evidence of any importance of this kind was the statement by the Moulton woman to the defendant that "he ought to lick [deceased], or he was no friend of hers," or words of that import. This statement was made on the night of the homicide, just before it occurred, and perhaps on one former occasion. On the night of the homicide, after this remark was made, he left the woman, and borrowed the revolver, and went to the saloon where deceased was, and the talk, the affray, and the shooting immediately occurred. There was evidence given tending to show that after the shooting defendant told the officer who took him into custody that he expected this would come sooner or later; it was too bad; but the old lady kept at him, kept nagging at him, and there he was. Under these circumstances we think the evidence of what the Moulton woman said to him was competent as showing motive, and bearing upon the whole transaction at the time of the shooting. It was so close to the time the shooting was done, and the defendant acted so soon after the remark was made, that it might fairly be inferred that the remark as made influenced defendant in bringing about the altercation and affray which resulted in the death. The case here is clearly distinguishable from People v. Larubia, 140 N. Y. 87, 35 N. E. 412, where the remark was made by a woman to the defendant, six months before the homicide, that, if the deceased's life was not taken, they would not be happy.

A single remark of that kind long before could hardly have had any influence upon the defendant in the commission of the homicide. The court said in that case that the inference could not be justified that defendant entertained the same feelings, or shared in the belief that the death of the deceased was essential to their mutual happiness. In this case the defendant at once, after the remark was made, set out to procure his revolver, and bring about the meeting with the deceased that resulted in the death. We think no error was committed in the admission of this evidence, considering all the other evidence in the case.

There were no other exceptions taken on the trial calling for special consideration. The court has more or less discretion as to the extent of cross-examination and as to the details of evidence that should be given, and no reversal should be based upon what may seem to be technical errors, but which could not have been injurious to the defense. No reversible errors were committed during the trial and before the jury retired to deliberate upon a verdict.

3. It was said, however, that a new trial should have been granted for the reason that the jury were allowed to take the revolver in the jury room while deliberating upon the verdict, without the consent of the defendant, and in violation of section 425 of the Code of Criminal Procedure. That section provides:

"The court may permit the jury, upon retiring for deliberation, to take with them any paper or article which has been received as evidence in the cause, but only upon the consent of the defendant and the counsel for the people."

The "case" and exceptions do not show that anything was said or done with reference to the revolver, or that it was given to the jury before they retired for deliberation. The affidavits used upon the motion for a new trial show, however, that after the charge had been completed, and before the jury had retired for deliberation, the counsel for the people asked if there was any objection to the exhibits in the case being taken by the jury to their room for inspection, and the court asked whether the defendant's counsel consented to the jury taking the exhibits to their jury room, and defendant's counsel replied that they would decide that when the question arose, or when the jury asked to have the exhibits before them; that, after the jury had retired, in a private talk with the presiding justice, the defendant's counsel said they did not wish the exhibits to go into the jury's hands, because the revolver was not then in the same condition as at the time of the homicide, and they feared an improper inference might be drawn by the jury from the appearance of the revolver as it was at the time of the trial, and asked said justice to refuse their request in case the jury should at any time ask to have the revolver for inspection. This talk was not in open court, or in the presence or hearing of the jury or the counsel for the people. It appeared from the affidavits of the sheriff and one of the constables who had charge of the jury that about 6 p. m., while the jury were deliberating upon the verdict, and when the presiding justice and the counsel on both sides and the defendant himself were absent from the court room, the jury asked the constable for the exhibits in the case, and the sheriff took the revolver from the

clerk's desk, gave it to the constable, and he delivered it to the jury. It was in the possession of the jury until about 6:45 p. m. The officers state that they heard the talk in court above referred to, and understood the jury were to have the revolver, if they wanted it. The affidavit of the constable who delivered the revolver to the jury shows he heard it being snapped in the jury room while the jury had it. It does not appear when or how the knowledge came to the presiding justice or the counsel that the revolver had been taken into the jury room, or how it came to be taken away from the jury. It appeared from affidavits and from evidence given upon the trial that the revolver worked more easily at the time of the homicide than at the time of the trial, and it appeared from the affidavits that the revolver was exhibited freely upon the trial, was handled and snapped by counsel upon both sides and by the defendant himself during the taking of the evidence, and by the counsel during their summing up. Affidavits made by all the jurors were read upon the hearing of the motion on the one side or the other as to what occurred while the jury had the revolver. There was some disagreement between the jurors as to the facts sworn to by them, respectively, but the preponderance of the evidence given by them was that the examination of the revolver while they had it in no way influenced their verdict, or operated to the injury of the defendant. It seems to be well settled that affidavits of jurors, in criminal as well as civil cases, are inadmissible for the purpose of impeaching their verdict. People v. Hartung, 17 How. Prac. 87; Id., 4 Parker, Cr. R. 256, 315, 317; Dalrymple v. Williams, 63 N. Y. 363, 20 Am. Rep. 544; Wilson v. People, 4 Parker, Cr. R. 632; Williams v. Montgomery, 60 N. Y. 648. So far, therefore, as the affidavits of the jurors may have tended to impeach their verdict, they were inadmissible, and, we assume, were not considered in the court below in determining the motion. The motion was made under section 465 of the Code of Criminal Procedure, which, so far as applicable here, provides as follows: "The court * * * has power to grant a new trial when a verdict has been rendered against the defendant by which his substantial rights have been prejudiced * * * in the following cases: * * * When the jury * * * have been guilty of any misconduct by which a fair and due consideration of the case has been prevented," etc.; and section 463 provides that "a new trial can be granted * * * only in the cases provided in section 465." And the court of appeals have said in reference to this section 465 that "the trial court is authorized to grant a new trial, provided they can see that the 'substantial rights' of the defendant have been prejudiced, and not otherwise." People v. Johnson, 110 N. Y. 144, 17 N. E. 684. The contention on the part of the defense was and is that the jury were guilty of misconduct in calling for and taking the revolver into the jury room and examining and snapping the same while they were deliberating upon the verdict. The revolver was a self-cocker, we assume (though it is difficult to find evidence in the record to this effect), and it worked easier at the time of the homicide, as the defense claimed, than at the time of the trial; and it is said that the jury may have been misled in examining and snapping it in the jury room, and may, therefore, have concluded that the defendant did not

testify truly in saying that the revolver was discharged the second time (when the death resulted) accidentally, and without his intending that it should be so discharged. The justice who presided during the trial, and who heard the motion with great deliberation and care, de-cided, under all the circumstances, that the substantial rights of the defendant were not prejudiced by the examination of the revolver by the jury during their deliberations. His opportunity for passing upon this question was better than ours. The determination of the ques-tion rested more or less in his discretion, and we are not inclined to disagree with him in the result at which he arrived. The evidence having been given upon the trial and before the jury that the revolver, after laying unused from the time of the homicide until the time of the trial,—a period of about six months,—did not work so easily when the jury examined it as when the defendant used it at the homicide, we may assume that the jury had this fact in mind when they examined it; and, counsel upon both sides and the defendant himself having during the trial snapped the revolver frequently in the presence of the jury, and called their attention to it, we cannot see how the addi-tional examination of it by the jury, the extent of which does not appear, could have produced any improper influence upon them preju-dicial to defendant's substantial rights. Verdicts in these cases should not be set aside upon merely technical grounds. The rights of defend-ants should be carefully guarded, but the express provisions of sections 463 and 465 only permit the court to grant new trials when substantial rights have been prejudiced.

The trial of this case was very carefully conducted by an able im-partial justice, and it was not claimed the error of permitting the re-volver to be taken into the jury room was due to any action of such presiding justice. It occurred by reason of the carelessness of the constable and the sheriff of the county, they and the jury themselves apparently understanding the talk between counsel and court to have been that the jury might have the exhibits in the case whenever they asked for them. Defendant's counsel did not then state plainly in the presence of the jury that they would not consent to the jurors having the exhibits, and contented themselves with a refusal of such consent in a private conversation with the presiding justice, out of court, in the absence of the jury and counsel for the people. The presiding justice very likely had in mind, when he determined the motion the circumstances under which he and the counsel discovered that the jury had taken the revolver in the jury room, and how it happened to be taken from them 45 minutes later, which was 3 hours before they finally rendered the verdict. The record is entirely silent as to these matters, but we assume the presiding justice had knowledge with ref-erence thereto, and that they influenced his decision of the motion. It does not appear that any objection was made to the presence of the revolver in the jury room by the defendant or his counsel, or that any motion was made with reference thereto until it was known that the verdict was adverse to the defendant, and then the question was raised by their motion for a new trial.

Under all these circumstances we do not feel called upon to reverse the order denying the motion for a new trial. Our conclusion is,

therefore, that the judgment and order appealed from should be affirmed, and the case remitted to Cayuga county, pursuant to section 547 of the Code of Criminal Procedure.

Judgment and order affirmed, and case remitted to Cayuga county court, pursuant to section 547 of the Code of Criminal Procedure. All concur.