[Crim. No. 1632. Third Appellate District.—July 30, 1938.]

THE PEOPLE, Respondent, v. BYRON LEE FITCH, Appellant.

Hardin Barry for Appellant.

U. S. Webb, Attorney-General, and Gordon S. Hughes, Deputy Attorney-General, for Respondent.

THOMPSON, J.—The appellant shot and killed Earl C. Smith at Tule Lake in Modoc County, July 21, 1937. He was convicted of murder of the second degree.

It is contended the verdict and judgment are not supported by the evidence; that the court erred in receiving testimony of the good reputation of the deceased for peaceableness, and in giving to the jury certain instructions.

Earl C. Smith and the defendant's sister, Grace, were husband and wife. They owned seventy-three acres of farm land

near Alturas upon which they had resided for five years. They had one son, who was thirteen years of age at the time of the homicide. Mr. Smith was a large man, six feet, two inches tall, and he weighed 200 pounds. The defendant was six feet tall, but he had been sick and he weighed only 117 pounds. The defendant resided in Pasadena. From year to year he had been accustomed to go north and live in the home of his sister, Grace, during farming seasons, helping to produce potatoes and onions in partnership with his brother-in-law. Domestic trouble arose between Mr. and Mrs. Smith. She procured a divorce from him in August, 1936. The defendant was a witness in her behalf at the divorce proceeding. The farm was divided between the spouses. Mrs. Smith was awarded the thirty-five-acre tract containing the dwelling house and barn. Earl Smith built a cabin on his portion of the ranch about a quarter of a mile from his wife's house. He sometimes ate and slept in the house of his wife after the interlocutory decree was granted. In a voluntary statement made by the defendant and transcribed immediately after the shooting occurred, he said that Mr. Smith had not personally threatened him, although he thought that he did blame him for his domestic troubles. The defendant said in that regard:

''Well, we put in the crop [in 1936]. He and his wife had trouble, and he could not take the blame on his own shoulders, so he had to blame me. Q. Why would he blame you? A. Well, he thought I was the cause of their family trouble. Q. What would he actually say [to you] about this matter? A. *He would not say anything to me about it,* he would not say that I was the cause of the trouble, but he commenced to treat me that way, that I was not welcome, and I thought at that he blamed me for the trouble. Q. *But he never at any time ever said anything directly to you about this trouble?* A. *No.* Q. *You are sure?* A. *Yes, sure.*''

In January, 1937, the defendant returned to his home in Pasadena. Thereafter John Fitch, the brother of the defendant, and his wife, came from Montana and lived in the home of their sister, Mrs. Smith, until after the homicide occurred. Their mother, Mrs. Clementine Fitch, a widow, who was seventy years of age, also came to live with her daughter.

The defendant returned to his sister's home at Tule Lake in July, 1937, a few days before the homicide occurred. The

defendant, Mrs. Smith, and her son, the defendant's brother John and his wife, and their mother were then all living together in the Smith home. His brother John kept an automatic revolver in the bureau drawer in his room. The defendant slept upstairs in the east bedroom. He was then engaged in digging a potato pit in the field on his sister's premises, adjacent to the roadway, some distance from the house. After returning to Modoc County in July, 1937, the defendant did not see Earl Smith prior to the time of the shooting, for he was employed in the trucking business, hauling produce from Sacramento to Tule Lake. The defendant testified at the trial that after he returned from Pasadena he was told by his brother John that Earl Smith had threatened to kill him if he came back to the ranch. Having discovered his brother's revolver in the bureau drawer, the defendant secretly took it and carried it to the field with him for two days prior to the homicide. On the morning of the affray the defendant was told that Smith had returned to his cabin. About 8 o'clock that morning the defendant again secretly took his brother's revolver from the bureau drawer, and concealing it inside the top of his right boot, he drove to the field to continue his work on the pit. Prior to the time of the shooting a neighbor lady called at the Smith home for some eggs. Mrs. Fitch, the mother of the defendant, rode with that lady across the field to the place where the defendant was working. At that point she left the machine and crossed a ditch to the locality of the potato cellar, and was present when the shooting occurred. Mrs. Smith and her brother John related circumstances of the affray which they claimed to have observed from a considerable distance. Otherwise, Mrs. Clementine Fitch and the defendant were the only eye-witnesses to the homicide.

The defendant testified that he secretly took his brother's revolver, as he had previously done, and tucked it into his boot top to defend himself against an anticipated attack by Earl Smith, who had threatened to kill him if he returned to the ranch. He said: ''I knew I was going to be working alone, and I wanted to take the gun with me for protection.'' He drove his team of horses over to the potato cellar some time after 8 o'clock the morning of July 21st, and began to work on the pit. His mother arrived soon thereafter. In a short time Earl Smith drove along the road in his truck and stopped

adjacent to the pit. The defendant said that Smith got out of his truck and walked over to a point eight or ten feet away from him and said:

"I warned you about coming back up here, you skinny ungrateful s-of-a-b. He kept abusing me, and I told him to go away, that I was not bothering him. Then he said I owed him four hundred eighty dollars and would give me four days to pay it. I said I did not owe him anything, but if I did, I would pay him. I told him to go and get in his truck and leave me alone. . . . He started away and walked off four or five steps and then turned around rapidly and called me a g— d— lying thief and s-of-a-b, and started back toward me. As he started back, he put his right hand to his hip pocket as if to pull out a gun and I pulled my gun and stopped him."

Continuing his description of the affray, the defendant testified:

"Q. What did Smith do when you fired the first shot? A. He put his left hand here. [Illustrating.] Q. Did you keep on shooting? A. Yes sir, I fired after that. Q. How far away from you was he? A. About eight or nine feet, something like that. . . . Q. Then what did he do? A. He turned his [left] shoulder around toward me. . . . Q. Did you keep on shooting? A. Yes sir. Q. What did Mr. Smith do next if anything? A. He turned around facing the north. . . . Q. Which side was towards you? A. His right side. Q. Were you still shooting? A. Yes sir. . . . Q. Were you afraid of Earl Smith? A. Yes sir. Q. For what reason? A. Because he was a man with a violent temper. Q. . . . Were there any other reasons that you were afraid of him? A. Because he had threatened me."

The defendant emptied his revolver, firing six bullets into the body of Mr. Smith, who then fell to the ground and lay in the roadway, where he died. The defendant reloaded his revolver, and taking his mother he went back to the house, leaving the body of deceased where it had fallen. He finally drove to town and surrendered to the officers, telling them he had killed Smith. Mr. Smith was not armed with a weapon.

The mother corroborated her son in his story of the shooting, except that she testified that as Smith approached he said, " 'I will kill you' or 'I am going to get you,' . . . And put his hand back to his hip pocket." Both Mrs. Smith and

the defendant's brother John testified they saw Smith approach the defendant, and that they observed him with his arm raised in a threatening position. Neither of them claimed to have actually seen the shots fired. Both of them testified to numerous previous threats on the part of Earl Smith to kill the defendant if he returned to the farm.

The defendant testified to no actual threats which the deceased made to him personally until the trial of the case, except that he said upon one occasion in 1936, when the defendant was nailing some boards on a chicken house in which their crop of onions had been stored, Smith objected to his work and defendant testified in that regard:

"He abused me and called me an ungrateful, skinny, s-of-a-b, and put his hands up . . . like he was going to put them around my neck, and said, 'I will break every bone in your skinny body.' "

On that occasion Mrs. Smith interfered, and Smith went away. During the trial of the case, for the first time, the defendant told of several occasions upon which he claimed Smith had threatened his life. For instance, he told of overhearing Smith the previous summer when he came home late, muttering to himself as he went upstairs in his own home threatening "to choke me and break every bone in my body. . . . I was afraid to go to sleep, I was afraid I would be killed in my sleep." The defendant testified that he then told the officers, Roy Dycert and Mr. Kowolowski of those threats. These statements, however, were not corroborated at the trial. Kowolowski was not called as a witness. Mr. Dycert was interrogated as follows:

"Q. I will ask you to state if he came to see you and what he told you? A. Yes sir, he did. He came to me, and I believe the statement was, they seemed to be having trouble or difficulty, and if things were not cleared up between him and Smith, *he was going to have to kill Smith*. Q. He said he would have to kill Earl Smith? A. That is right. Q. Is that about all he said to you? A. There was a little more conversation. It was to the effect that Mr. Smith had been abusing the defendant, was why he was going to have to kill him."

Doctor John McKenny testified that he found three bullets which had entered the back of Mr. Smith near the left shoulder; that there was one bullet which entered the right thigh;

one entered the right side of the chest beneath the tenth rib and followed an upward course penetrating the right lung and passing through "the top two chambers of the heart"; that the last-mentioned bullet caused his death. Another bullet plowed into the chest from the left side and came out "through the fleshy part of the [right] forearm below the elbow".

The attorney-general earnestly argues from the location of the six bullet wounds and from the medical expert testimony that the defendant first shot Mr. Smith three times in the back as he was walking away from him, and that he afterwards fired the remaining shots which took effect in the right thigh and in the chest as the deceased turned around or as he lay upon the ground after he had fallen as a result of the shots in his back. The evidence is susceptible of that construction. After a careful reading of the record, we are not satisfied he was first shot in the back. If we were perfectly satisfied of that fact there would be no difficulty in sustaining the verdict on the theory of a wanton and cowardly murder perpetrated without semblance of justification. We are of the opinion the problem is not so simple.

It does, however, appear there is sufficient evidence to support the verdict and judgment of conviction.

If it be true that the deceased threatened to kill the defendant if he returned to the farm and that the defendant knew of that threat and armed himself for fear of bodily harm at his hands, and that the deceased approached him in anger, threatening and cursing him, and that he actually reached toward his hip pocket where a man usually carries a revolver, the defendant would have been justified in shooting his assailant and should have been acquitted on the doctrine of self-defense.

Every reasonable inference which may be drawn from the evidence should be resolved in support of the verdict. The defendant was ably defended before a just and able judge, with a fair jury, in a community where all the interested parties have resided for years and are well known. The deliberate killing of the deceased by the defendant having been conclusively established, the burden of proving justification or excuse therefor rested on the defendant in the absence of evidence tending to show that it merely amounted to manslaughter or that it was justifiable or excusable. (See.

1105, Pen. Code; 13 Cal. Jur. 733, sec. 102; *People v. Jones,* 160 Cal. 358, 370 [117 Pac. 176].) The jurors were the sole judges of the credibility of the witnesses and of the weight and sufficiency of the evidence. They were not bound to accept the defendant's assertion that he acted in self-defense, believing that he was about to receive great bodily harm at the hands of the deceased, provided the circumstances of the case are reasonably susceptible of the theory of his guilt. Evidently the jurors did not believe the defendant acted in fear of imminent danger of his life or of great bodily harm. Their verdict is irreconcilable with the theory of self-defense.

 What are the circumstances justifying the jurors in rejecting the evidence of necessary self-defense on the part of the defendant? The following facts may be suggested in reply to that question: Immediately after the shooting occurred the defendant made a voluntary statement in which he failed to charge the deceased with having previously made threats against his life. He merely related the domestic trouble which existed between Mr. and Mrs. Smith, and said *"he would not say anything to me about it,* he would not say that I was the cause of the trouble, but he commenced to treat me that way". Then in reply to the direct question, "But he never at any time ever said anything directly to you about this trouble?" the defendant said "No." Then came the inquiry, "You are sure?", to which he replied, "Yes, sure." Those answers are inconsistent with the repeated statements made by the defendant at the trial to the effect that the deceased had personally threatened his life. Moreover, the defendant at the trial, for the first time, related an incident in which he claimed the deceased had threatened to "break every bone in my body", and he said "I told those things to [the officer] Mr. Dycert". Mr. Dycert was called as a witness and asked if the defendant had related those facts to him. In effect Dycert contradicted him, for he said the defendant merely told him "they seemed to be having trouble" and that "if things were not cleared up", he, the defendant, *"was going to have to kill Smith".* This indicated no fear of Smith, but rather a deliberate threat to kill him. The story of the threats on the part of the deceased, as related by the relatives of the defendant, are so uniform in

language as to raise the presumption they were invented for the purpose of defense.

The jury was warranted in concluding that if the defendant was really afraid of bodily harm at the hands of the deceased, he might easily have avoided a conflict by remaining at his home in Pasadena instead of returning to antagonize his brother-in-law. The fact that the defendant secretly armed himself with his brother's revolver and hid it in his boot leg is consistent with the previous threat which he made to Dycert that he would have to "kill Smith". It is reasonable to inquire why the defendant carefully avoided letting even the members of his own household know that he was arming himself with a loaded revolver.

The circumstances of the affray, as related by the defendant, seem quite unusual. The deceased had no weapon on his person. He was not armed with a revolver. The defendant said he had never known of his carrying a weapon. The deceased was a large, powerful man. If, in fact, he reached toward his hip pocket, it was a bluff, which he did not need to resort to. Why should a man who was so apparently superior to his antagonist in vigor and strength, pretend to reach for a revolver if he had purposely come to administer corporal punishment? Would a sensible man deliberately plan to openly and violently attack another in the very presence of his mother, whom he might expect to become a witness against him? Did the deceased actually threaten the defendant? Did this unarmed victim actually reach toward his pocket? These are questions the jury evidently resolved against the defendant.

The story of the actual shooting seems improbable. The defendant said that the deceased stopped his truck as he drove along the roadway and coming over to within eight or ten feet of where he and his mother stood, he said, "I warned you about coming back up here, you skinny, ungrateful s-of-a-b." Then he immediately added that "I owed him four hundred eighty dollars, and would give me four days to pay it." The defendant replied that "I did not owe him anything and I told him I would let the law settle it." The defendant said the deceased then turned around and started back toward his truck, but without further provocation he suddenly wheeled about and returned again, angrily cursing the defendant and calling him "a g— d— lying thief and a

s-of-a-b''. When he reached a point eight or ten feet away, the defendant says that he reached toward his hip pocket. The sudden change of purpose on the part of the deceased, as related by the defendant, seems strange. The attorney-general argues that the evidence conclusively shows that the defendant then deliberately shot the deceased three times in his back, as he was going toward his truck. Assuming, however, that the deceased did suddenly change his plan and that without apparent reason he did return to assail the defendant, was it reasonable or necessary that the defendant should have shot this unarmed man six times, three of which bullets took effect in his back? The defendant says that at his first shot the deceased raised his hand and placed it over his chest where he assumed the bullet hit him. If that be true, was the defendant warranted in firing five other bullets into his body? The defendant does not pretend that the deceased made any movement to procure a weapon or to assail him, after the first shot was fired. From the attitude and conduct of the deceased after that first fatal shot, it must have been apparent that he was so seriously disabled that he was then harmless. The defendant merely says that he continued to fire the other five shots because the deceased failed to fall to the ground. The conduct of the defendant was hardly that of a frightened man who shoots and kills an unarmed person in what he deems to be necessary self-defense.

The entire defense is founded on the asserted belief that the deceased was a violent and a dangerous man who had repeatedly threatened to kill the defendant if he returned to Tule Lake. The evidence of such pretended threats is related by the relatives of the defendant, except for one circumstance told by another close friend. If the decedent was a man of violent temper and of dangerous character, his neighbors should have been aware of that fact, for he had lived in that community for several years, and was well known. Yet nine witnesses testified that his general reputation for peaceableness was good. No character witness was sworn to rebut that fact. Moreover, the defendant himself testified he had never known of the deceased carrying a weapon.

We are of the opinion these and other circumstances disclosed by the record warranted the jury in rejecting the defense of killing the deceased in the belief that the accused was in imminent danger of great bodily harm or of the loss

of his life. The verdict and judgment are adequately supported by the evidence.

■ The court did not err in receiving evidence of the the good reputation of the deceased for peace and quietness in rebuttal of the evidence first adduced by the defendant upon his plea of self-defense to the effect that the deceased was a large, powerful man with a violent temper; that he was cruel and dangerous and had frequently threatened to kill the defendant. The defendant first placed in issue the character of the deceased for peaceableness by contending that he was by nature a violent, brutal and dangerous man, and that he shot and killed him with knowledge and in fear of his dangerous character and previous threats, actually believing he was about to receive from him great bodily harm or that he might be killed. The defendant testified in that regard:

"He was a man with a violent temper. . . . He had threatened me. . . . He was a big man, and strong, and I have been sick, and much smaller than he. . . . I knew he was going to carry out his threats. . . . He threatened to get me if I ever came back. . . . He threatened to kill me, I carried a gun to keep him from doing it."

Nine witnesses testified to the good reputation of the decedent for peace and quietness. No character witness was called by the defense to rebut that evidence. The authorities appear to be uniform in support of the rule admitting evidence of the general good character of the decedent for peace and quietness in a homicide case when the defendant relies on a plea of self-defense and attempts to justify the killing of his adversary on the ground that he knew him to be a violent and dangerous man who had threatened his life, and contending that he killed him from fear and in the belief that he was about to receive great bodily harm. (*People* v. *Howard,* 112 Cal. 135, 140 [44 Pac. 464] ; 13 Cal. Jur. 693, sec. 77; 30 C. J. 172, sec. 395; 13 R. C. L. 916, sec. 219; Wharton on Homicide, 3d ed., sec. 270; *De Woody* v. *State,* 21 Ariz. 613 [193 Pac. 299] ; 25 Cal. Law Rev. 459.) In 30 Corpus Juris, page 173, section 395, it is said:

"Where defendant attempts to show that deceased was a violent and dangerous man, the state may properly offer proof of his peaceable and law-abiding character. . . . If accused undertakes to justify the homicide on the ground

of threats made by deceased it is held that the state may prove that the general character of deceased was that of an inoffensive man, and one not reasonably to be expected to execute the threats.''

In 13 California Jurisprudence, page 693, section 77, it is said:

''While the general rule is that the reputation of deceased cannot be given in evidence, an exception arises where the plea of self defense is interposed, and the evidence leaves it in doubt whether the deceased was the aggressor, or where the circumstances attending the homicide render it doubtful whether the defendant was justified in believing himself in imminent danger at the hands of deceased. . . .

''The prosecution may introduce evidence in rebuttal to sustain the good character of the deceased for peace and quietness, after it has been attacked by the defendant.''

In the De Woody case, *supra,* the court clearly explains the exception to the general rule with respect to the exclusion of testimony of the general reputation of the deceased for peaceableness, as follows:

''When the defense in a prosecution for homicide puts the character of the deceased as a quarrelsome, turbulent, or violent and dangerous man in issue, the state may support it by proofs that the deceased was a peaceable, quiet and law abiding man. Wharton on Homicide (3d Ed.) par. 269. Furthermore, the attack on the character of the deceased need not be directed as to his general reputation to render admissible evidence of his good character on the part of the state. It is immaterial in what manner the attack is made, whether by evidence of general reputation or by any other species of evidence. If the issue is raised by the defense at all, the state may meet it by evidence of general reputation as to good character. Wharton on Homicide (3d Ed.) par. 270; *People* v. *Gallagher,* 174 N. Y. 505 [66 N. E. 1113], affirming 75 App. Div. 39 [78 N. Y. Supp. 5]. No general rule can be laid down for the determination of what will be held to constitute an attack by the defendant on the character of the deceased so as to 'open the door' for rebuttal on behalf of the state, but each case must be decided according to its own circumstances or facts. 13 R. C. L. Par. 219, p. 917; *Kelly* v. *People,* 229 Ill. 81 [82 N. E. 198, 11 Ann. Cas. 226, 12 L. R. A. (N. S.) 1169].''

In the present case a direct attack was made upon the character of the deceased by the defendant. Under the circumstances of this case it was therefore proper to receive evidence of the general reputation of the deceased in that community for peace and quietness to aid the jury in determining who was the aggressor in the affray and to ascertain whether the defendant was warranted in shooting the deceased in the belief that he was in imminent danger of receiving great bodily harm at his hands.

■ The defendant was not prejudiced by the sustaining of an objection to a question, "Q. Did you have any personal knowledge . . . of his beating his cows until they gave bloody milk and bawled for mercy?" That question was remote and cumulative. The defendant had already testified that, "I knew what he would do to me if he got hold of me. This man was mean and he was brutal. He had whipped his wife and blacked her eyes, and put her in bed, and has beat his cows until they gave bloody milk and bawled for mercy, and I knew it was best for a man like that not to get hold of me. . . . I knew what he would do to me *from what I had seen him do.*"

■ The court did not err in permitting the district attorney to cross-examine the defendant on his examination in chief, with reference to the alleged voluntary statement of the defendant made by him immediately after the shooting occurred. In accounting for the original statement which the defendant made he testified as follows:

"Well, after I talked to him [Mr. Wylie, the District Attorney], he insisted that I should plead guilty and be sentenced without a jury trial, and when I would not do that, he got pretty hot and told me he could pick a jury that would hang me."

On cross-examination, without objection from the defense, the following colloquy occurred:

"Q. Isn't this what I told you, that you had shot Mr. Smith in the back, and to save the county money and the expense of a trial, it would be best for you to plead guilty, and if you did not plead guilty, I would do my best to hang you? A. You said you had hung one and would hang another. . . . You said 'I have hung one and can hang another, and you can get twelve lawyers if you want them'."

There was no motion to strike out the preceding language. The district attorney then said:

"Q. I want to get that statement. You say I told you in my office, in the presence of those parties, that you had better plead guilty, and if you did not, I could pick a jury of twelve citizens of this county that would hang you."

To this question the defendant objected on the ground that it was incompetent and irrelevant. No objection was made that it was not proper cross-examination. The objection was overruled, and the defendant replied, "That is what he said".

The voluntary statement to which the defendant referred was introduced in evidence without objection. It was not contended that it was procured by intimidations or threats. The defendant volunteered the statement that the district attorney threatened to select a jury which would hang him if he did not plead guilty. The truthfulness of that statement was a material and proper subject of cross-examination. The evidence was already in the record. The reply to the last question was merely cumulative. It was not error to overrule the objection.

■ The court did not err in giving to the jury the following instruction:

"You are instructed, members of the jury, that the deceased, Earl C. Smith, had the right to go onto the land where defendant was working excavating for the potato cellar to attempt to collect money which the deceased believed was owing to him from the defendant, and if you find from the evidence in this case beyond a reasonable doubt that the deceased, Earl C. Smith, did do this, yet even if you further find from the evidence that the deceased did curse defendant and shake his hands or fists at defendant and abuse him by words, yet unless you believe from the evidence that the deceased reached for a gun or a weapon or attempted in some manner to do defendant great bodily harm or death which defendant had reason to believe therefrom would cause defendant great bodily harm or death, I instruct you that the defendant was not justified in invoking the right of self-defense. The law of self-defense being a law of necessity, the law requires that before it can be invoked the defendant, acting and thinking as a reasonable man under such circumstances would act and think, must have honestly believed that he was in immediate danger of great bodily harm or

death at the hands of deceased before he would have the right to take the life of the deceased.''

The preceding instruction is not misleading. In effect it clearly charges the jury that the deceased had a right to go upon the land where the defendant was digging a potato pit to attempt to collect money which he believed the defendant owed him, and that if the jury believed from the evidence beyond a reasonable doubt that that was the purpose of the deceased, even though they also believed the deceased then cursed and abused the defendant and shook his fists at him, the defendant would not be justified in shooting and killing him unless they also believed from the evidence ''that the deceased reached for a gun or a weapon *or attempted in some manner to do defendant great bodily harm or death which defendant had reason to believe therefrom would cause defendant great bodily harm or death*''.

In other words, the jury was merely told that the mere cursing of the defendant and the shaking of the fists of the deceased at a distance of eight or nine feet was not sufficient upon which to justify the shooting, and that, on the contrary, the defendant was not warranted in killing him under the circumstances of this case unless the deceased actually reached toward his hip pocket, or did some overt act which the defendant then believed placed him in immediate danger of great bodily harm or death. The court then correctly defined the doctrine of self-defense. There is no statement in the challenged instruction from which the jury could infer that the defendant was required to prove the overt acts of the deceased beyond a reasonable doubt. The jury was immediately thereafter instructed that:

''The defendant had a right, at the time of firing the fatal shots, to consider fully all acts of violence that he had seen the deceased commit, all threats that he had heard the deceased make, together with the disposition of the deceased as the defendant knew it, in order that the defendant might know or believe what the deceased meant or intended at the time the fatal shots were fired.''

Then the jury was clearly and specifically instructed that ''a person may lawfully take the life of another when the circumstances are sufficient to excite the fears of a reasonable man. . . . It is not necessary that the danger be actual, but . . . it is enough if it be apparent.'' The jury was

further instructed that if the defendant believed that he was in immediate danger of great bodily harm, he had a right to act upon the appearances as they presented themselves and would be justified in killing his adversary, if the attack was sudden and the danger seemed imminent, even though the deceased was not in fact armed with a weapon, and that the defendant could so act, under such circumstances, without first retreating or attempting to do so. The jury was fully and fairly instructed on every essential element of the charge of murder, and regarding the doctrine of self-defense.

We are of the opinion the record contains no prejudicial or reversible error.

The judgment is affirmed.

Pullen, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on August 13, 1938, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 25, 1938.