UNITED STATES v. BROXMEYER.

No. 62, Docket 22110.

United States Court of Appeals
Second Circuit.

Argued Oct. 4, 1951.

Decided Oct. 30, 1951.

trade." Garthe v. Ruppert, 264 N.Y. 290, 296, 190 N.E. 643, 646.

Myles J. Lane, New York City (Robert M. Reagan, Albert A. Blinder and Leonard Maran, all of New York City, of counsel), for appellee.

S. Robert Zimmerman, New York City, Jack Perlman, New York City, for appellant.

Before SWAN, Chief Judge, and CLARK and FRANK, Circuit Judges.

FRANK, Circuit Judge.

■ 1. Broxmeyer was convicted, after a jury trial, of using the mails to defraud and of misapplying the funds of an insured bank in violation of 18 U.S.C. § 1341 and § 656. The evidence showed that, within a period of three weeks, Broxmeyer deposited with the Peoples Industrial Bank $150,000 in checks, none of which was covered at the time of its issue. Broxmeyer was able to make many of the checks good by rushing covering deposits to the banks on which the checks were drawn before their presentment for payment. Finally, however, the Peoples Bank grew suspicious and refused him further credit on

checks he deposited. Broxmeyer, then, unable to make the covering deposits in the other banks, failed to meet payment on bad checks aggregating $107,000. He insists that intent to defraud was not proved and that, since such intent is an essential element of both crimes, his convictions cannot stand. He says that, according to the evidence, he intended and fully expected to be able, to meet payment on all the checks, citing as proof his monthly rent rolls and extensive real estate holdings. We think there was evidence on which the jury could find beyond a reasonable doubt that Broxmeyer knew, when he deposited his last $107,000 of uncovered checks, that he could not raise sufficient funds to cover them. The government put in persuasive evidence showing his desperate need at this time for cash, and his frantic efforts to obtain it before the deposit of these checks. The fact that Broxmeyer was the unfortunate victim of his own financial manipulations, or that he would have paid these checks if his check-cashing chain had not broken, does not alter his intent to defraud, if he had no reason to believe that his legitimate sources of income would suffice to make the checks good.

2. Broxmeyer claims error in the trial court's exclusion of evidence concerning the market and assessed value of his properties and the equity remaining in his mortgaged holdings. He offered the evidence to show his financial ability, and thus his intent, to meet the checks when they became due. The government had previously introduced evidence of the sizable mortgages on Broxmeyer's properties and his need for cash to meet them. The standard for judging the relevance of Broxmeyer's proffered evidence was whether it bore directly upon his liquidity at that time—i. e., whether his holdings could have been converted readily into cash to meet the checks. Since Broxmeyer later testified, and government witnesses had already mentioned, that the defendant was engaged in negotiations for refinancing additional loans on mortgaged properties during this period, we think the excluded evidence was relevant. But the error was not important, for the excluded evidence would have shown only the potential maximum loan or sale price which Broxmeyer could hope to raise. There was evidence received of the amounts for which he was actually negotiating or the sale offers actually made—proof which bore far more directly on the issue of liquidity than remoter evidence of equity and market price. The evidence of the properties' assessed values was properly excluded, for it had far too remote a relation to what Broxmeyer could have raised on his properties.

3. The defendant asserts that the trial court erred in failing to define "check-kiting" in the charge. "Check-kiting" was a word of art used recurrently, with different meanings, throughout the trial. The government's witnesses accused Broxmeyer of "check-kiting," i. e., scheming to meet payment on the checks of one bank by drawing uncovered checks on another bank, etc. Broxmeyer admitted to "check-kiting," but defined it as the simple process of drawing a check on insufficient funds with the intention of making the check good by a deposit before its presentation for payment. So "check-kiting" was a short-cut phrase which both sides used to describe Broxmeyer's operations—although with different meanings. There was no reason for the judge to inject his definition into the semantic dispute. "Check-kiting" was a part neither of the indictment nor of the statutory violation. The trial judge's only reference to the term in his charge came when he repeated the testimony of a government witness who said Broxmeyer had engaged in a "check-kite." That witness had fully described on the stand exactly what he meant by the term. We see no error here.

4. The charge is also challenged because it failed to define specifically enough the "intent to defraud" which it said was a necessary element of both crimes. The judge did not tell the jury—in accord with defendant's requests—that there could be no such intent if Broxmeyer planned and expected to be able to meet all the checks at presentment time. The jury was told simply that they must find whether an intent to defraud existed from a consideration of all the circumstances of the

case and the reasonable inferences to be drawn therefrom. We think that charge sufficient. The intent to defraud in this sort of offense is basically no different from the intent to defraud in any other kind of crime. Whenever a man has no real intention of cheating anyone out of anything, there is no intent to defraud. There is no reason to believe that this jury would go against the clear meaning of these words and find an intent to defraud had they actually believed that Broxmeyer intended and reasonably expected to be able to meet the checks, and that he had no notion of throwing the risk of non-payment on anyone else.

 5. The most serious error alleged by the defendant is an exchange between himself and the prosecutor. On cross-examination, government counsel asked Broxmeyer if he knew it was a crime in New York to issue checks backed by insufficient funds.[1] Actually it is a crime under New York law to issue an uncovered check only if (as in the federal offense) there is an intent to defraud; that the funds are insufficient will alone not do. The trial judge required counsel for the government to insert the word "knowingly" in this question. The defendant replied repeatedly that he did not know it to be a crime, that in his opinion it would become one only if the checks were not met. His lawyer supported this view. The judge's modification of the question still left it inaccurate in its implications. But the whole exchange was only remotely relevant, since a definite intent to defraud was necessary under the

---

1. The entire colloquy reads as follows:

"Q. All right, now Mr. Broxmeyer, weren't you aware that it is a crime, under New York State law, to issue a check without having funds in the bank?

"Mr. Zimmerman: If your honor please, I object to that.

"Mr. Spieler: That is not the law, in the first place.

"Mr. Block: Oh, yes, I submit that it is.

"Mr. Zimmerman: I object to that and move to strike it out.

"The Court: I will let him answer.

"Q. Weren't you aware, Mr. Broxmeyer that it is a crime under New York State Law to issue a check without having funds in the bank to meet it at the time it is issued? Did you know that?

"The Court: Well, there is one word that you didn't put in that question, and that is 'knowingly.'

"Mr. Block: 'Knowingly.' Well, he has admitted that he knew that at the time—but I will put in 'knowingly.'

"Q. Didn't you know, Mr. Broxmeyer, that it was a crime under New York State Law? A. I didn't know the law, Mr. Block.

"Q. You didn't know then that this was a crime, did you? A. No, because I always—

"Q. Nobody ever told you that; is that correct? That what?

"Q. That it was a crime.

"Mr. Zimmerman: That what was a crime?

"A. If you didn't pay it it was a crime.

"Mr. Zimmerman: I object to the form of the question and ask that the answer be stricken out.

"The Court: I will let it stand. He hasn't answered that.

"Q. Well, let us come back to what I am talking about, Mr. Broxmeyer. We will try to make it very simple. Now, did you say that you knew that at the time some of those Anna Glick checks were issued that there wasn't enough money in the bank to meet that check? Isn't that right. You told me that before. A. Yes.

"Q. And I say to you, didn't you know that issuing a check under such circumstances is a crime under New York law? A. Do you want me to say that?

"Q. I am asking you, didn't you know whether issuing a check under such circumstances was a crime under New York law? Didn't you know that? A. I knew if it wasn't paid it would be a crime.

"Q. But you didn't know that it was a crime to issue a check without having funds in the bank to meet it, knowing it, knowingly, did you? A. If it wasn't paid I knew it would be a crime.

"Q. But you didn't know that it was a crime to issue a check, knowing that you didn't have enough funds in the bank to meet it? You didn't know that that was a crime? A. I answered that question, Mr. Block.

"Q. Would you mind answering it again? You say you didn't know that? A. I knew if you didn't pay it it would be a crime.

"Q. Well, that isn't really an answer, you see, to the question I am asking. A. That is the only answer I know, Mr. Block."

federal statute, regardless of New York law, and the judge, in his charge, was careful to emphasize this essential element. We are not convinced that the prosecutor's questions misled the jury and affected the verdict, for, apart from this alleged error, the evidence is so strong that we think no reasonable jury could have acquitted the defendant. See Horning v. District of Columbia, 254 U.S. 135, 41 S.Ct. 53, 65 L.Ed. 185; Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557.

Affirmed.