Norman J. DESCHENES, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 5054.

United States Court of Appeals
Tenth Circuit.

July 9, 1955.

A. D. Weiskirch, Wichita, Kan. (A. Lewis Oswald, Hutchinson, Kan., on the brief), for appellant.

William C. Farmer, Wichita, Kan. (Milton P. Beach, Oskaloosa, Kan., Selby S. Soward, Topeka, Kan., Chas. W. Ward, Peabody, Kan., and Royce D. Sickler, Topeka, Kan., on the brief), for appellee.

Before PHILLIPS, Chief Judge, MURRAH, Circuit Judge, and WALLACE, District Judge.

MURRAH, Circuit Judge.

The appellant, Norman J. Deschenes, and his co-defendants Lowell F. Reinhardt and LeRoy O. Kretzer, were prosecuted upon an indictment consisting of eight counts, each charging the use of the mails for the purpose of effecting a scheme or artifice to defraud in violation of 18 U.S.C. § 1341. Reinhardt and Kretzer pleaded guilty, were placed on probation and testified against appellant at his trial. Upon a jury verdict of guilty, the appellant was sentenced to three years imprisonment on each of the eight counts, the sentences to run concurrently. Appellant does not deny his role in the "scheme" alleged in the indictment, but assigns numerous errors in the trial of his case, based on alleged erroneous admission of evidence, preju-

dicial conduct of the trial court and of the United States Attorney, and erroneous instructions of the court to the jury.

The alleged scheme to defraud as developed by the evidence consisted of a "check kiting" scheme. Appellant, a public accountant, was retained, among other clients, by the Salt City Electric Company of Hutchinson, Kansas. Co-defendant Kretzer was a partner in the Company. In the early part of 1952, the Company was in a precarious financial condition with insufficient funds to meet its payroll and other expenses. As a result of a discussion concerning the matter between appellant and Kretzer, appellant contacted co-defendant Reinhardt, a relative by marriage, who lived at Bison, Kansas. Reinhardt agreed to help save the Company from bankruptcy and the "kiting" plan was devised. Knowing that both Reinhardt and the Company had insufficient funds in their respective accounts, Reinhardt and the appellant agreed that Reinhardt would furnish the Company his personal checks in exchange for checks of like amounts from the Company. The Company would deposit the Reinhardt checks from time to time in the Central State Bank of Hutchinson, and for the period of time required for the Reinhardt checks to clear through the normal banking channels through the United States mails and be delivered to the Bison State Bank to be charged against Reinhardt's account, the Company would receive credit from the Hutchinson Bank. When the Reinhardt checks arrived at the Bison Bank, he would immediately deposit Company checks of like amount to cover them.

This check exchange continued from March 1952 until about September 1952, when a State Bank Examiner at the Bison Bank became suspicious and discovered the scheme. During the life of the scheme, the face amount of the kited checks totalled $713,350, and the largest overdraft in the Company and Reinhardt accounts was $14,155.83.

Appellant first contends that no scheme to defraud is shown since it was intended at all times to ultimately pay the kited checks; and that in any event, the mails were not used in furtherance of such scheme since any alleged crime was committed and completed immediately upon depositing the checks in the respective banks before they were placed in the mail for clearance and collection. United States v. Lowe, 7 Cir., 115 F.2d 596, 598, is a complete and conclusive answer to this contention. Under indistinguishable facts, the court held that the plan was to obtain checking account credit from the bank, and that such credit "is a thing of value." And, the court went on to say, "The defendant included in his scheme the use of a banking practice which necessarily required the forwarding of the deposited check for collection, a practice which would enable the defendant to utilize, at least temporarily, the credit given him by the Chaseburg Bank; and the utilization of this practice was as much a part of the scheme to obtain credit as the drawing and presenting of the worthless check."

■ Clearly, the appellant here knew and intended that the mails would be used in transferring the checks from one bank to the other in the regular course of business. In fact, the time consumed by such transfer was the very essence of the scheme which made it possible, and this practice constitutes a violation of the mail fraud statute. Federman v. United States, 7 Cir., 36 F.2d 441; United States v. Feldman, 2 Cir., 136 F.2d 394.

■ At the beginning of the trial, the court, when examining the jury, asked if any of them were then or had been peace officers, to which juror Miller replied that he had been a guard or employee at some penal institution. No objection was made to this juror and he subsequently became foreman of the jury. After the trial, appellant learned for the first time that Miller was a member of the Wichita, Kansas Crime Commission, and contends that since the fact was admittedly known to the trial court on voir dire, the juror should have been

dismissed as a "peace officer". When this matter was presented in an argument on a motion for new trial, the trial court was of the view that being a member of the Wichita Crime Commission did not make Miller a peace officer. In his brief, appellant describes the Wichita Crime Commission as a group of voluntary citizens organized for the purpose of detecting and suppressing crime, but we can find nothing in the record to show the nature or functions of the Commission or the members thereof. Certainly there is nothing from which we can conclude that its members were peace officers. The trial court did not so consider the juror and we will not infer it from the statements in the brief. It cannot be said that membership in the Wichita Crime Commission was "so obvious a disqualification or so inherently prejudicial as a matter of law * * * as to require the court * * * to set the verdict aside and grant a new trial." Frazier v. United States, 335 U.S. 497, 513, 69 S.Ct. 201, 210, 93 L.Ed. 187; See, also, Cavness v. United States, 9 Cir., 187 F.2d 719.

On several occasions when appellant was testifying, the court admonished him to "eliminate those side remarks. Now I mean what I am telling you. * * * Well, we are going to conduct this case in a dignified and orderly manner. * * * You answer counsel's question instead of asking counsel questions yourself. * * * Now, that is not an answer, you are arguing with counsel again, the very thing that I have told you that I won't permit * * *." Appellant contends that these remarks made as he attempted to testify in his own behalf confused and intimidated him to his prejudice before the jury. It was of course within the province of the trial court as the governor of the trial to admonish witnesses to answer questions fairly propounded, and not to engage in argumentative discourses. Harris v. United States, 5 Cir., 8 F.2d 841; Brink v. United States, 6 Cir., 60 F.2d 231. A review of the testimony shows that the admonitions of the court were clearly justified in the interest of an orderly trial.

Appellant also complains of the conduct of the United States Attorney in the examination and interruption of character witnesses for the appellant. The United States Attorney asked preliminary questions of these witnesses as to whether they had talked to anyone in the community concerning appellant's reputation, and when they answered "no", the court ruled that they were not qualified to testify as to his reputation. It is suggested with good reason that one's reputation is never the subject of conversation unless it is bad, for one having a good reputation seldom provokes outward comment. On that hypothesis, silence speaks in his favor and the fact that a character witness has never heard ill said of the defendant is evidence within itself of a good reputation. On this theory the witness was permitted to say that he had never heard the defendant's character for truth and veracity questioned in the community. The court, however, sustained the government's objections to the stock question of whether the defendant's reputation in the community for truth and veracity and law obedience was good or bad on the premise that since he had never heard it discussed, he was incompetent to testify concerning it. Unfortunately, "one's reputation is what others say about him, not necessarily what they know of him." Interstate Securities Co. v. United States, 10 Cir., 151 F.2d 224, 226, and cases cited. And, a character witness is incompetent to testify concerning one's general reputation based solely upon his own personal knowledge of the person. State v. Todd, 28 N.M. 518, 214 P. 899; State v. Williams, 38 Wyo. 340, 266 P. 1056; Berneker v. State, 40 Neb. 810, 59 N.W. 372; 20 Am. Jur., Evidence, § 326, p. 307. The trial court correctly permitted the United States Attorney to question the witnesses for purposes of qualification and prop-

692

erly ruled on the admissibility of the proffered evidence.

■ When appellant and his two co-defendants were questioned as to whether they intended to cheat and defraud the banks and to use the mails in the operation of the check kiting scheme, the trial court rejected such testimony, stating, "that is a question for the jury." Later, after a discussion with counsel for appellant, the witnesses were recalled and permitted to testify in that regard. Appellant and his co-defendants testified that they had no intention to cheat the banks; that the original plan was to run only one check through hoping that funds would be available to cover it; that they didn't contemplate that the banks would lose anything or that the mails would be used in furtherance of the scheme. Appellant claims that by permitting the witnesses to be recalled, the trial court did not cure the former erroneous ruling. In that respect it is contended that since the jury had already gotten the court's version of the worth of the testimony, it was prejudicially harmful; that the force and effect of the evidence, when finally elicited, was practically nil, and to a great extent destroyed the whole defense of the lawsuit. We cannot agree that the exclusion of competent testimony leaves in the minds of the jury such a lingering doubt concerning its worth as to impair its probative value when subsequently admitted in the course of the trial under the corrected ruling of the court. To indulge in this presumption would deny the indisputable power of the court to correct its ruling on admissibility of evidence.

■ During the course of the trial, an agent of the Federal Bureau of Investigation, by the use of a graphic schedule, testified to the daily overdraft positions of both banks as a result of the kiting scheme. Relying on Elder v. United States, 5 Cir., 213 F.2d 876, 881, appellant contends that admission in evidence of this chart was reversible error. In that case, the court criticized the admission of a chart prepared by the Federal Bureau of Investigation showing in brief and graphic form information on the interstate transportation of stolen automobiles, on the theory that the chart represented only "isolated pieces of evidence in such brief and graphic form as to purport to forge the links in the chain of evidence so closely and so convincingly as to completely destroy defendant's claim that he was the innocent tool of a professional and accomplished criminal." The court held, however, that in view of instructions to the jury, the admission of the chart was not reversible error. But the schedule under consideration here does not purport to represent a chain of events, it merely reduced in concise form a summary of the checks and other exhibits, all admitted in evidence, and showing the amounts of the overdrafts at the banks during the operation of the scheme. There was no error in admitting this schedule. Graves v. United States, 10 Cir., 191 F.2d 579; Carlson v. United States, 10 Cir., 187 F.2d 366. Moreover, no question was raised as to its admissibility at the trial of the case or on the motion for new trial, and it may not be raised here on appeal for the first time.

■ The jury was instructed: "If, therefore, you believe beyond a reasonable doubt that this defendant, when he put in circulation or caused to be put in circulation, the checks in evidence in this case, knew that the account of the Salt City Electric Company in the Central State Bank of Hutchinson, Kansas, was insufficient to honor said checks on presentation, and he further knew that in the ordinary course of events there would not be sufficient funds in the account of Salt City Electric Company to honor said checks when they were presented other than by the deposit in rapid succession of checks of L. F. Reinhardt, drawn on the Bison State Bank, Bison, Kansas, which he knew or should have known were insufficient fund checks themselves, in an endless chain, then you will be justified in finding that the necessary intent existed."

This charge is challenged, first, because it failed to point out the essential element of intent to defraud, but elsewhere in the court's instructions, the jury was told: "The crime with which this defendant is charged consists of two elements. First, devising or intending to devise any scheme or artifice to defraud, and second, using, or causing to be used, the mails in the execution or attempted execution thereof." And, in another place, the jury was told: "Intent is something that in a way exists in a man's mind and cannot always be proved by exact and demonstrable evidence. Therefore one's intent has to be judged, to a certain extent, at least, by his intelligence as shown by the evidence; by his experience in life as shown by the evidence; and generally by judging him as reasonable, prudent men, experienced in the every day affairs of life, judge each other, and it is the law that a person intends the usual and probable consequences of his acts." It cannot be said that the jury would go against the clear meaning of these words to find appellant guilty if they did not believe beyond a reasonable doubt that he intended to cheat and defraud the banks as charged. United States v. Broxmeyer, 2 Cir., 192 F.2d 230.

Appellant also contends that the court's use of the descriptive words "deposit in rapid succession", "insufficient fund checks" and "in an endless chain" was highly prejudicial because it assumed facts which were within the province of the jury to determine. There is no basis for this contention. These terms were used freely and often in the course of the trial to describe the transactions and they do not become prejudicially harmful when the court chooses to use them in the same vernacular in its characterization of the charge under the adduced facts. Considered as a whole, the court's instructions were proper and correctly apprised the jury of all elements of the offense.

The final question is whether conferences of the court and counsel on questions of law at the bench or in chambers, out of hearing of the appellant and the jury, denied appellant his constitutional right to be present at every stage of the trial. In the first place, neither appellant nor his counsel made a specific request for appellant to be present at these conferences, and no complaint or objection was lodged to the practice. He therefore cannot complain of any possible prejudice. Steiner v. United States, 5 Cir., 134 F.2d 931, certiorari denied 319 U.S. 774, 63 S.Ct. 1439, 87 L.Ed. 1721. Moreover, it is settled law that the exclusion of a defendant and a jury from the courtroom during argument on a question of law does not violate defendant's constitutional right to be present at every step of the proceedings. United States v. Johnson, 3 Cir., 129 F.2d 954, 144 A.L.R. 182, affirmed on other grounds, 318 U.S. 189, 63 S.Ct. 549, 87 L.Ed. 704.

The judgment is affirmed.