**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Henry BESSESEN and Buni Bessesen,**
**Defendants-Appellants.**

**No. 18319.**

United States Court of Appeals,
Seventh Circuit.

July 6, 1971.

Rehearing Denied Aug. 19, 1971.

464

Jerome Rotenberg, Chicago, Ill., for defendants-appellants.

William J. Bauer, U. S. Atty., Michael H. Berman, John Peter Lulinski, Michael P. Siavelis, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before KILEY, FAIRCHILD and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

Henry A. Bessesen, also known as Henry J. Adrian, and his wife, Buni A.

Bessesen, also known as Buni A. Adrian, were charged in each count of a five-count indictment with mail fraud violations of 18 U.S.C. § 1341.

Henry Bessesen was found guilty by a jury on all counts and was sentenced for five years on counts 1 and 2, the sentences to run concurrently, and for five years on counts 3, 4 and 5, the sentences to run concurrently but consecutively to the counts 1 and 2 sentences and to sentences theretofore imposed on him by the United States District Court for the District of Minnesota, Fourth Division. Buni Bessesen was acquitted on counts 1, 2 and 3, and was found guilty on counts 4 and 5. She was sentenced to one year on count 4 and placed on probation for a period of five years on count 5. The Bessesens have appealed. We affirm.

Henry Bessesen ("defendant") was an actor from 1937 to 1948. During that period, he used the name Henry Adrian; thereafter he used both names but appeared to prefer Adrian. In the early 1950s he incorporated the Bessen Company in Illinois to distribute washing machines. He also organized another corporation known as Illinois Dishwasher and Remodeling Corporation. He opened checking accounts for the Bessen Company at the Upper Avenue National Bank of Chicago in 1953, for Illinois Dishwasher at Mid-America National Bank of Chicago in 1957, and a personal account for himself and his wife Buni, using the Adrian name, at Mid-America in 1959.

Bessen Company became inactive in 1956 or 1957 and Illinois Dishwasher ceased doing business in 1958 or 1959, but defendant did not close out either of the checking accounts. About the same time, defendant started a business in Chicago to provide credit cards for health expenses called Credit Health System. He opened a checking account for that organization at National Boulevard Bank of Chicago in 1959.

In 1960 defendant left Chicago and went to Arizona. The four bank accounts at the three Chicago banks were all kept open.

Exactly what happened to the Credit Health System when defendant went to Arizona was not made clear by defendant's testimony, but the total evidence on the subject shows the following facts: Defendant sold a franchise license to a Mr. Castelli in Tucson, Arizona, who (defendant presumed) in turn sold the license to Leah Rosa Simpson in 1961. Mrs. Simpson's attorneys incorporated Credit Health System, District 3, Division 1 of Arizona. At this point defendant testified that Mrs. Simpson became his "boss." However, the office manager of Credit Health System, Tucson, testified that she was employed "for Mr. and Mrs. Adrian"; defendant "owned" the business, was its president and made the business decisions; the home office was at 600 South Michigan, Chicago; the number of employees fluctuated from 4 to 10 and one of the employees in 1960 was Mr. Castelli; and that Mrs. Simpson was "our landlord." Mrs. Simpson's attorney testified that Credit Health System of Arizona, District 3, Division 1, never was a going concern; that Mrs. Simpson owned the premises at 532 North Fourth Avenue, Tucson; that those premises were occupied by two of defendant's businesses—Commerce and Health Credit System and Commerce and Health Development Corporation; and that Mrs. Simpson was not defendant's boss.

In any event, defendant and his wife opened a checking account in their Adrian names at the Southern Arizona Bank of Tucson in 1960; they opened an account for the Two-Fund Health Credit System, a division of Arizona Credit Health System, at the Arizona Bank of Tucson in 1961.

In 1962, the Tucson Inn was owned by the Egbarth Corporation, the capital stock of which was in turn owned by Phil Baker and Lyndon Miner. Defendant testified that on October 15, 1962, Mrs. Simpson bought Baker and Miner's stock in Egbarth by executing and issuing a promissory note in the amount of $250,000 to each of them and by assuming a first mortgage held by the Ameri-

can Insurance Company for $600,000. Mrs. Simpson was supposed to invest an additional $100,000 in the Inn to convert the hotel rooms into efficiency apartments. Defendant, in return for his services as manager of the Inn, was to receive a one-third ownership when it became a paying proposition. He signed the notes as a co-signer with Mrs. Simpson; he became president and his wife became secretary and treasurer of Egbarth Corporation; and the stock in Egbarth was transferred to defendant and his wife, who then signed the stock certificate to Mrs. Simpson in blank and delivered the stock to her.

Mrs. Simpson's attorney testified that Mrs. Simpson was 89 years old, frail and blind, and had periods of mental confusion and memory lapses; that she had income of about $10,000 a year; and that her assets consisted primarily of the real estate upon which was situated her home, which she sold in 1962 or 1963 for $100,000, less than $20,000 of the purchase price being in cash. He further testified that Mrs. Simpson had been advised by his law firm not to invest in the Tucson Inn; that she told him that she did not sign any notes in connection with it; and that when she was sued for $287,500 by Phil Baker in August, 1965, her defense was that if the note was signed by her at all, her signature was secured by trick, artifice and fraud by misrepresentation of the instrument signed.

Defendant described Mrs. Simpson as a "very wealthy woman" who was very active and used a large magnifying glass which she kept in her purse for reading. He admitted, however, that she was "very old looking" and could have been anywhere from 60 to 95 years of age. The defendant's office manager for the Credit Health System testified that Mrs. Simpson was "close to 80" and "she was almost blind."

In any event, defendant and his wife opened a checking account in the name of Second Fund Tucson Inn, a division of Egbarth Corporation, at the Bank of Tucson on February 19, 1963; they opened an account for the Bagdad Club and Carousel Club, which were part of the Tucson Inn, at the First National Bank of Arizona at Tucson on February 19, 1963.

At this point in time, defendant and his wife were signatories on four active checking accounts in three Chicago banks and on four active accounts in four Tucson banks. The payment due each month on the Tucson Inn first mortgage was in excess of $5,000, the monthly payments due on the Baker and Miner notes were $1,900 each, and the Inn was losing about $3,000 each week. Defendant testified that Mrs. Simpson promised to pay the Tucson Inn expenses; that she did so for a time until she had put in about $40,000; and that she then gradually stopped paying those expenses.

Taking advantage of the fact that it takes several days to clear checks between banks in different cities and the fact that often banks will honor checks drawn against uncollected funds and accept overdrafts for a period of time, the defendants drew checks upon one bank where there were no or insufficient funds in favor of another bank; before the checks reached the drawee bank for payment other checks were drawn against another bank where there were no or insufficient funds and deposited in the drawee bank. When, as here, the checks must be drawn and passed in rapid succession in an endless chain, the procedure is characterized as check-kiting. The defendant's accelerated check-writing activity apparently began shortly after opening the last two Tucson accounts on February 19, 1963, and the tempo and volume quickly picked up until a crescendo was reached in May, 1963. One of the banks, the Mid-America National Bank of Chicago, discovered the abnormality of the defendants' account about May 28, 1963, and a few days later the check-flow was ended.

An internal auditor for the Post Office Department testified that the total deposits to the Two-Fund Credit Health System account at the Arizona Bank during the period of May 14 to May 24, 1963 amounted to $177,662, of which

$114,630 was deposited from checks drawn on Chicago banks. Total deposits to the Arizona banks during this period were $443,372, of which $370,966 was made up of deposits of checks drawn on. Chicago bank accounts. Total deposits to the Illinois banks during this period totaled $300,267, of which $299,574 was deposited to the Chicago banks on checks drawn on the Arizona banks.

In four days $69,000 in worthless checks were deposited at the Arizona Bank; in three days $49,915 of worthless checks were deposited in the Bank of Tucson; in five days $43,000 of worthless checks were deposited at the First National Bank of Arizona; $51,801 of worthless checks were deposited to the Southern Arizona Bank and Trust Company; in a three-day period $31,000 in worthless checks were deposited to the account at the Mid-America National Bank of Chicago; and $25,388 was deposited to the Upper Avenue National Bank of Chicago during a six-day period. Deposits amounting to $349,000 in worthless checks were deposited during the seven-day period. The total amount of loss to four banks was $84,085.99.

Defendant conceded upon cross-examination that when he deposited those checks in those banks, he knew there were not enough funds to pay them all. An FBI agent testified that he met defendant in September, 1963, in Minneapolis, where defendant had moved in May, 1963; that defendant told him he had deposited checks upon accounts he knew had no or insufficient funds but he was able to take advantage of the several days' time lag that it took for the checks to clear from one bank to another; that on some days he had to write as many as a hundred checks and had to maintain a worksheet to keep track of all the checks; that at first he just used two or three banks but later he used all seven banks because he wanted to spread the risk around and minimize the potential loss to any one bank; and that he considered his check-writing activities the same as having bank loans which matured every twenty-four hours.

Upon this appeal the defendant and his wife have contended (1) that certain instructions denied should have been given and others given should have been denied; (2) that prejudicial hearsay testimony was admitted; (3) that the trial court abused its discretion by denying defendants' request for a continuance for the purpose of producing additional witnesses; and (4) that the evidence was insufficient to sustain the conviction of Buni Bessesen.

I

The defendants' first contention is that the district court failed to instruct the jury upon their theory of defense.

██ ██ The defendant in a criminal case is entitled to have the jury consider any theory of defense which is supported by law and which has some foundation in the evidence, however tenuous. United States v. Vole, 435 F.2d 774, 776 (7th Cir. 1970); United States v. Grimes, 413 F.2d 1376, 1378 (7th Cir. 1969). The theory of the defendant and his wife in this case was that they entertained a reasonable expectation that sufficient funds would be deposited by Mrs. Simpson in time to pay the checks when they were ultimately presented for payment. This theory is supported by law. United States v. Broxmeyer, 192 F.2d 230, 232–233 (2nd Cir. 1951); Williams v. United States, 278 F.2d 535, 537 (9th Cir. 1960); United States v. Gross, 416 F.2d 1205, 1212 (8th Cir. 1969), cert. denied, 397 U.S. 1013, 90 S.Ct. 1245, 25 L.Ed.2d 427 (1970); First National Bank v. Insurance Co., 424 F.2d 312, 318–319 (7th Cir.), cert. denied, 398 U.S. 939, 90 S.Ct. 1844, 26 L.Ed.2d 272 (1970); People v. Rubin, 223 Cal.App.2d 825, 36 Cal.Rptr. 167 (1963). See also Annotation, "Reasonable Expectation of Payment as Affecting Offense Under 'Worthless Check' Statutes," 9 A.L.R.3rd 719. The theory also had some foundation in the evidence, based upon the defendant's testimony that Mrs. Simpson had previously "covered" his overdrafts.

The defense tendered a long, rambling theory instruction for the defendant and

a second instruction pertaining to his wife. Both of the defense theory instructions included a detailed description of the purported evidence and inferences the defense drew from that evidence. The district court rejected the two proffered instructions. In Alaska Airlines v. Oszman, 181 F.2d 353, 12 Alaska 667 (9th Cir. 1950), the court stated at page 353:

"It is of course true that the theories of parties to a court action should be given the jury by way of instructions or charge and this the court adequately did. But this does not mean that a party has the right to have the jury charged upon every inference it thinks should be drawn from the evidence adduced. The court charged the jury in an unimpeachable manner as to the issues in the case which amply covered the theory of the parties—on the one side that the indebtedness existed, on the other that it never had existence. The court exercised its discretion by choosing not to comment upon or to attempt to analyze the evidence and it told the jury to weigh the evidence and find its verdict therefrom. The rejected proposed instructions, if given would have called attention more to a particular point in the case than to appellant's theory of the case. We think the court was under no compulsion to do this."

The defense did not attempt to alter the form of the instructions or to submit alternative instructions. The primary responsibility rests with counsel to make fair and proper requests to charge. United States v. Leach, 427 F.2d 1107, 1113 (1st Cir.), cert. denied, 400 U.S. 829, 91 S.Ct. 95, 27 L.Ed.2d 59 (1970); United States v. Hamilton, 420 F.2d 1096, 1099 (7th Cir. 1970). The defendant in a criminal case will not ordinarily be heard to complain of the trial court's failure to set out in its charge his specific theory or theories of defense, unless he has himself formulated them into proper tendered instructions. Apel v. United States, 247 F.2d 277, 282 (8th Cir. 1957).

However, in this case we need not rest on that principle; we can assume arguendo that this is a situation where a request for an instruction which is not in proper form may impose upon the court the duty to give a proper instruction, whether tendered or not, upon that particular subject matter. Chicago & N. W. Ry. Co. v. Green, 164 F.2d 55, 61 (8th Cir. 1947); United States v. Napue, 401 F.2d 107, 112 (7th Cir. 1968), cert. denied, 393 U.S. 1024, 89 S.Ct. 634, 21 L.Ed.2d 568 (1969).

Jury instructions must be considered in their entirety. The instructions here, taken as a whole and also in specific detail, fully expressed the legal principles applicable to the defense of both defendant and his wife that they relied in good faith upon a reasonable expectation of payment of the checks and, applicable to the wife alone, that she acted upon the direction of her husband. United States v. Hamilton, 420 F.2d 1096, 1098 (7th Cir. 1970). The district court charged the jury in part:

"Defendants have offered evidence of their good faith in making the representations alleged in the indictment. Good faith is a complete defense to the crime of mail fraud. In determining whether defendants acted in good faith or with the intent to defraud, you should consider all the facts and circumstances in the case. If you find that defendants acted in good faith they should be found not guilty.

\*    \*    \*    \*    \*    \*

"If you find that Mrs. Bessesen's acts, as they relate to the transactions in question, were performed solely at the direction and under the control of her husband, and without knowledge of the character and nature of the transactions that took place, then you must find her not guilty."

In addition, the trial court instructed the jury comprehensively upon the elements of the crime of mail fraud, the meaning of "knowingly" and "willfully," and the following instructions on "intent":

"The crime charged in this case requires proof of specific intent before

the defendants can be convicted. Specific intent, as the term implies, means more than the general intent to commit the act. To establish specific intent the government must prove that the defendants knowingly did an act which the law forbids, purposely intending to violate the law. Such intent may be determined from all the facts and circumstances surrounding the case.

\* \* \* \* \* \*

"The phrase 'intent to defraud' used in the crime charged means that the act was done knowingly with the specific purpose to deceive in order to cause financial loss to another or financial gain to one's self."

These instructions go far beyond what the court considered a sufficient instruction regarding the theory of reasonable expectation of payment in United States v. Broxmeyer, 192 F.2d 230 (2nd Cir. 1951), where the court said at pages 232–233:

"The charge is also challenged because it failed to define specifically enough the 'intent to defraud' which it said was a necessary element of both crimes. The judge did not tell the jury—in accord with defendant's requests—that there could be no such intent if Broxmeyer planned and expected to be able to meet all the checks at presentment time. The jury was told simply that they must find whether an intent to defraud existed from a consideration of all the circumstances of the case and the reasonable inferences to be drawn therefrom. We think that charge sufficient. The intent to defraud in this sort of offense is basically no different from the intent to defraud in any other kind of crime. Whenever a man has no real intention of cheating anyone out of anything, there is no intent to defraud. There is no reason to believe that this jury would go against the clear meaning of these words and find an intent to defraud had they actually believed that Broxmeyer intended and reasonably expected to be able to meet the checks,

and that he had no notion of throwing the risk of non-payment on anyone else."

The defendant and his wife also objected to the giving of the following instruction:

"However, if you believe beyond a reasonable doubt that the defendants, when they put in circulation or caused to be put in circulation the checks which are in evidence, knew that the funds in the bank accounts on which these checks were drawn were insufficient to pay these checks on presentation, and that the defendants further knew that in the ordinary course of events there would not be sufficient funds in the bank accounts of the drawee banks to pay these checks when they were presented other than by the deposit in rapid succession of other checks drawn by the defendants which they knew or should have known were insufficient fund checks themselves, in an endless chain, then you will be justified in finding that the necessary intent to defraud existed."

A virtually identical instruction was approved in Deschenes v. United States, 224 F.2d 688, 692 (10th Cir. 1955). Most of the language in the instruction was first enunciated by this court in an early check-kiting case, Federman v. United States, 36 F.2d 441, 442 (7th Cir.), cert. denied, 281 U.S. 729, 50 S.Ct. 246, 74 L. Ed. 1146 (1929).

Finally in regard to instructions, defendant and his wife complain of the language in the charge, "If you find a defendant is guilty beyond a reasonable doubt of any one of the crimes charged in the indictment a verdict of guilty should be returned as to him," on the ground that "it gave the impression to the jury that a general verdict of guilty as charged in the indictment should be returned by them" in the event that the jury found a defendant guilty of any one of the five counts. The language objected to is part of an instruction included in the manual on jury instructions in criminal cases heretofore approved by

this court.[1] The complete instruction from the manual was given in the present case; it includes the following language appearing before the portion objected to: "Defendants have been charged with separate crimes in the various counts of the indictment. You should give separate consideration, and render separate verdicts with respect to each defendant, and to each count." We do not believe that the jury would be confused or misled by the instruction as a whole, particularly where, as here, the verdict forms given to the jury offered the jurors the opportunity to find the defendant and his wife guilty on some counts and not guilty on others.

## II

The defendants further contend that they were prejudiced by the admission into evidence of hearsay testimony through the government witness, Burt L. Haberman, an attorney from Tucson, Arizona, who had represented Leah Rosa Simpson. Mr. Haberman testified that Mrs. Simpson told him that she had not signed or co-signed the notes for the purchase of the Tucson Inn; and that in August, 1965, when Mrs. Simpson was sued by Phil Baker, the holder of one of the notes, for $287,500 plus interest, the primary defense was that if she had signed the note at all, her signature had been secured by trick, by artifice, by fraud, by misrepresenting the character of the instrument that she signed, not as a promissory note but as something else.

The defense attorney objected on the ground that "he is getting into the defense in another lawsuit." The district court overruled the objection. As Wigmore said, "A specific objection *overruled* will be effective to the extent of the grounds specified, and no further." 1 Wigmore, Evidence § 18 at 339 (3rd ed. 1940). See also, United States v. Indiviglio, 352 F.2d 276, 279–280 (2nd Cir. 1965), cert. denied, 383 U.S. 907, 86 S.Ct.

887, 15 L.Ed.2d 663 (1966). Judge Frank observed in United States v. Rosenberg, 195 F.2d 583, 596 n. 9 (2nd Cir.), cert. denied, 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 652 (1952): "We know, too, that an able trial lawyer, for one or more of a variety of reasons, will often withhold an objection to the reception of hearsay. When he has done so, and it turns out that the jury's verdict is adverse to his client, the lawyer may not assert that reception as error." See also, United States v. Marine, 413 F.2d 214, 218 (7th Cir. 1969), cert. denied, 396 U.S. 1001, 90 S.Ct. 550, 24 L.Ed.2d 493 (1970); United States v. Cook, 432 F.2d 1093, 1103 (7th Cir. 1970). Since the contention of hearsay advanced on appeal was not raised in the court below, this court will not entertain it in the absence of a showing of plain error, which is not shown here. United States v. Turner, 423 F.2d 481, 484 (7th Cir.), cert. denied, 398 U.S. 967, 90 S.Ct. 2183, 26 L.Ed.2d 552 (1970).

In any event, however, the defendant, testifying on his own behalf, was permitted to describe many conversations he had with Mrs. Simpson with no one present, whereas Mr. Haberman's testimony related to statements made by Mrs. Simpson in the presence of the defendant at two separate meetings in Mr. Haberman's law office. Since the defendant opened the door to evidence on the subject of his relation to Mrs. Simpson, he cannot complain that the government was permitted to introduce other testimony bearing upon that field of inquiry. United States v. Regents of New Mexico School of Mines, 185 F.2d 389 (10th Cir. 1950). The testimony regarding the other lawsuit was also germane to the subject matter introduced by the defendant. Professor McCormick refers to the right to "fight fire with fire." McCormick, Evidence § 57, at 132 (1954). Neither party called Mrs. Simpson as a witness.

1. Manual on Jury Instructions in Federal Criminal Cases, Seventh Circuit Judicial Conference on Jury Instructions, § 7.04

(1963), also reported at 33 F.R.D. 523, 606 (1964).

Under the circumstances we find no prejudicial error in the admission of Haberman's testimony.

### III

■ The defendants further contend that the trial court abused its discretion by denying defendants' request for a continuance for the purpose of producing additional witnesses after both sides had rested their cases. The defendants concede that it is well established that the trial court has a large discretion with respect to order of proof and permitting a party to reopen its case after it has rested. Rhyne v. United States, 407 F.2d 657 (7th Cir. 1969). Nevertheless the defendants argue that they were prejudiced by not being able to reopen the case to procure additional witnesses from Arizona, principally Mrs. Simpson.

The government put fifteen witnesses on the stand, nine of whom were residents of Arizona. The defendant and his wife were the sole witnesses on their own behalf. Since the defendants' only defense was their alleged reasonable expectation that Mrs. Simpson would cover their bad checks, they had to know from the day the indictment was filed on May 23, 1968, to the time of the trial more than a year later that Mrs. Simpson, assuming that she would testify favorably to them, would be their prime potential witness. The fact that the defendants failed to call her during the trial and elected instead to rely upon their own testimony as to what Mrs. Simpson had done and told them was a calculated risk they took. They cannot complain that the risk failed. The trial court properly exercised its discretion.

### IV

■ Finally, the defendants contend that the evidence was insufficient to sustain the conviction of Buni Bessesen.

The five counts in the indictment related to five separate mailings of specific checks. The check in count 1 was made payable to defendant Henry Adrian; the checks in counts 2 and 3 were made payable to Credit-Health Systems; and the checks in counts 4 and 5 were made payable to B. A. Adrian, who is Buni Bessesen. The jury found Mrs. Bessesen not guilty as charged in counts 1, 2 and 3 but guilty as charged in counts 4 and 5.

Reviewing the evidence in a light most favorable to the government, United States v. Lawler, 413 F.2d 622 (7th Cir. 1969), cert. denied, 396 U.S. 1046, 90 S. Ct. 698, 24 L.Ed.2d 691 (1970), the record reflects more than sufficient evidence to justify the jury finding that Buni Bessesen had knowledge of the "check-kiting" scheme and was thus, beyond a reasonable doubt, guilty of counts 4 and 5 of the indictment. As a secretary to her husband, she signed hundreds of checks and deposit slips as evidenced by the exhibits admitted into evidence. She admitted signing a large number of checks, some of which were filled out in blank prior to her signing. Some of these checks, which she subsequently endorsed, were payable to her. In addition, she thought that it was unusual that checks were payable to her totalling $43,000, since she didn't earn the money and didn't even know why they were payable to her. She contended that she merely gave these checks to her husband and didn't question him about it. Many of these checks were returned for insufficient funds. In addition, she signed all the corporate cards for the various bank accounts and was listed as a corporate officer in the corporate resolutions, including corporations that were nonexistent.

The knowing participation of Buni Bessesen in a "check-kiting" scheme may be established circumstantially even though *no direct evidence was introduced to show that she did in fact know that she was writing checks on insufficient funds.* The above facts constituted substantial evidence, even though circumstantial in nature, by which the jury could find beyond a reasonable doubt that Buni Bessesen had the requisite knowledge and intent. This is evidenced by the jury's specific finding of requisite knowledge

as to Buni Bessesen and thus her guilt as to counts 4 and 5, in light of the instruction set forth in section I of this opinion that she be found not guilty if she lacked such knowledge. The jury did not believe Buni Bessesen's contention that she had no knowledge of the "check-kiting" scheme in light of the numerous checks executed by her on Chicago banks and deposited by her in Arizona banks and checks executed by her on Arizona banks and deposited by her in Chicago banks, all within the same short period of time.

We conclude that the evidence was sufficient to sustain the conviction of Buni Bessesen.

The judgments of conviction of Henry Bessesen and Buni Bessesen are affirmed.